441 F.2d 514
 76 L.R.R.M. (BNA) 2817, 65 Lab.Cas. P 11,608
 J. P. STEVENS & CO., INC., GULISTAN DIVISION,
Petitioner-Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent-Cross-Petitioner.
TEXTILE WORKERS UNION OF AMERICA, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 Nos. 28631, 29037.
 United States Court of Appeals, Fifth Circuit.
 March 22, 1971.
 
 W. S. Blakeney, Charlotte, N.C. for J. P. Stevens & Co., Inc., Blakeney, Alexander & Machen, Charlotte, N.C., of counsel.
 Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., Washington, D.C., Walter C. Phillips, Director, N.L.R.B., Region 10, Atlanta, Ga., Allen H. Feldman, Atty., Washington, D.C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Nancy M. Sherman, Atty., N.L.R.B., for appellee.
 Cornelius J. Collins, Jr., Patricia E. Eames, Gen. Counsel, New York City (Textile Workers Union of America, AFL-CIO), B. Avant Edenfield, Statesboro, Ga. (Don Hughes and others), Charles H. Brown, Statesboro, Ga., Allen, Edenfield, Brown & Franklin, Statesboro, Ga., of counsel (Mildred G. Bailey and others, Employees), for intervenors.
 Before THORNBERRY, GOLDBERG, and AINSWORTH, Circuit Judges.
 GOLDBERG, Circuit Judge:
 
 
 1
 J. P. Stevens & Company, Inc., unchastened by and impervious to judicial homilies, once again seeks liberation from a National Labor Relations Board order. Taking the opposite position, the Textile Workers Union of America, AFL-CIO, entreats us to broaden the Board's order to combat Stevens' known predisposition to violate the law. Rejecting both of these positions, we enforce the Board's order in full.
 
 I.
 
 2
 The Textile Workers Union (hereinafter referred to as the Union) began its organizing campaign at J. P. Stevens' Statesboro, Georgia, plant in January of 1968. The Union made intensive efforts to secure authorization cards from the employees, efforts which met with determined resistence on the part of Stevens. On February 17, the Union wrote Stevens a letter in which it claimed that it was the representative of the majority of employees in a production and maintenance unit; demanded recognition by Stevens as exclusive representative of the employees in that unit; and stressed that if the Company had any doubts of the majority, the Union would submit the authorization cards in its possession to a disinterested third party. Stevens replied to the Union letter by stating that it had indications that a majority of its employees did not want union representation; that it did not wish a third party to check cards; and that it assumed that the Union would refer the matter to the Labor Board for disposition.
 
 
 3
 Thereafter, on February 21, the Union filed an election petition with the Board, and an election was scheduled for April 22 and 23, 1968. Prior to that election, on March 18, and again on April 20, the Union affirmed that its recognitional demand was a continuing one and invited Stevens to forego the election proceedings.[1] Stevens's officials declined these invitations.
 
 
 4
 On April 22 and 23, 1968, the Board conducted an election at the Stevens plant. The Union lost by a vote of 198 to 110 and filed timely objections. In response the Board's Regional Director, noting that 'it is unnecessary to consider the (Union's) remaining objections,' set the election aside because the Company had failed to submit an employee eligibility list as mandated by Excelsior.[2] The Union then filed unfair labor practice charges before the Board.[3]
 
 
 5
 In its unfair labor practice charges the Union alleged (1) that Stevens' antiunion conduct during February and March interfered with, restrained, and coerced company employees in the exercise of their section 7 rights in violation of section 8(a)(1) of the National Labor Relations Act;[4] (2) that Stevens' discharges of three employees and its refusal to hire an applicant for employment were in violation of section 8(a)(3) of the Act;[5] and (3) that Stevens' refusal to bargain with the Union following the recognitional demands was in bad faith and in violation of section 8(a)(5) of the Act.[6] These allegations were denied by Stevens and by 117 employees of Stevens who intervened in the proceedings on behalf of the Company. Following a hearing the Board, largely adopting the Trial Examiner's conclusions, found that the Company had violated sections 8(a)(1) and 8(a)(3) and ordered the traditional remedies.[7] Moreover, the Board found that Stevens' unfair labor practices had made a fair rerun election impossible. Relying on what it found to be a card majority for the Union on March 18, the Board ordered Stevens to recognize and bargain with the Union. In No. 28,631 Stevens and the intervening employees ask us to set aside this Board order in all respects, while in No. 29,037 the Union asks us to compel the Board to fashion a more farreaching remedy. The Board, in both actions, cross petitions for enforcement of its order as entered.
 
 II.
 
 6
 Stevens first claims that the record is devoid of substantial evidence in support of the Board's finding of section 8(a)(1) and section 8(a)(3) violations. We disagree. The record reveals, and the Board found, that Stevens engaged in an extensive campaign of 'classic, albeit crude, unlawful labor practices' to defeat the Union.[8] During the organizational campaign waged by the Union in February and March there were numerous instances of Company misconduct violative of section 8(a)(1). Supervisory personnel threatened that a Union victory would result in a reduction of work, extensive discharges, and even the closing of the plant. See NLRB v. Gissel Packing Co., supra, 395 U.S. at 617, 89 S.Ct. 1918; Textile Workers Union v. Darlington Mfg. Co., 1965, 380 U.S. 263, 274 n. 20, 85 S.Ct. 994, 13 L.Ed.2d 827; NLRB v. Varo, Inc., 5 Cir. 1970, 425 F.2d 293; NLRB v. Dowell Div. of Dow Chemical Co., 5 Cir. 1969, 420 F.2d 480; NLRB v. Neuhoff Bros. Packers, Inc., 5 Cir. 1967, 375 F.2d 372. Company officials engaged in blatant surveillance of Union activities. See NLRB v. Southland Paint Co., 5 Cir. 1968, 394 F.2d 717, 719-720; Hendrix Mfg. Co. v. NLRB, 5 Cir. 1963, 321 F.2d 100. Stevens' supervisors interrogated employees with regard to Union activities under circumstances that tended to be coercive and intimidating, see NLRB v. Varo, Inc., supra, 425 F.2d at 297-298; Ridgewood Management Co. v. NLRB, 5 Cir. 1969, 410 F.2d 738, cert. denied, 396 U.S. 832, 90 S.Ct. 87, 24 L.Ed.2d 83 and made promises of benefits calculated to undermine Union strength, see NLRB v. Varo, Inc., supra, 425 F.2d at 298-299. During a critical juncture in the Union campaign the Company granted certain benefits which the Board found were designed to destroy Union support. See NLRB v. Exchange Parts Co., 1964, 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435; Russell-Newman Mfg. Co. v. NLRB, 5 Cir. 1969, 406 F.2d 1280, 1283. Finally, when the Union organizing effort began, the Company breathed new life into a long dormant rule prohibiting all solicitation at the plant, even on nonworking time. See Republic Aviation Corp. v. NLRB, 1945, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372; NLRB v. Varo, Inc., supra, 425 F.2d at 297; NLRB v. K-D Mfg. Co., 5 Cir. 1969, 419 F.2d 467; Ridgewood Management Co. v. NLRB, supra, 410 F.2d at 740. Equally supported by substantial evidence are findings of the Board that Stevens violated section 8(a)(3) both before and after the representation election by discriminatorily discharging employees Connor, Akins, and Cribbs, all active Union supporters, and by discriminatorily refusing to hire applicant Bradley, a relative of an active Union adherent. See Phelps Dodge Corp. v. NLRB, 1941, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271; Reading & Bates, Inc. v. NLRB, 5 Cir. 1968, 403 F.2d 9; NLRB v. Neuhoff Bros. Packers, Inc., supra; Sarkes Tarzian, Inc. v. NLRB, 7 Cir. 1967, 374 F.2d 734, 738, cert. denied, 389 U.S. 839, 88 S.Ct. 64, 19 L.Ed.2d 102; NLRB v. Albritton Eng'r. Corp., 5 Cir. 1965, 340 F.2d 281, cert. denied, 382 U.S. 815, 86 S.Ct. 31, 15 L.Ed.2d 62.
 
 
 7
 We therefore hold that there is substantial evidence in the record as a whole to support the Board's finding of section 8(a)(1) and section 8(a)(3) violations, see Universal Camera Corp. v. NLRB, 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, and we enforce those portions of its order designed to eradicate the violations through what have been termed 'traditional remedies.'[9]
 
 III.
 
 8
 The Board, however, went beyond its traditional remedies and ordered Stevens to bargain with the Union. Recognizing that a rerun election is 'the preferred method for the determination of whether employees shall be organized collectively,' NLRB v. Gissel Packing Co., supra, 395 U.S. at 603, 89 S.Ct. at 1934, the Board here concluded that a bargaining order was necessary to effectuate the purposes of the Act.
 
 
 9
 In determining whether to enforce the Board's bargaining order we must be guided by the Supreme Court's decision in Gissel. That decision instructs us that where an employer has committed unfair labor practices a bargaining order, rather than a Board-conducted election, may issue under certain special circumstances. Balancing the sometimes conflicting goals of deterring employer misbehavior and effectuating employee free choice, the Court found two circumstances which would justify the bargaining order remedy. First, even where a union has never demonstrated majority support in an appropriate unit, the Board may issue a bargaining order where the employer unfair labor practices are so 'outrageous' and 'pervasive' that their 'coercive effects cannot be eliminated by the application of traditional remedies, with the result that a fair and reliable election cannot be had." NLRB v. Gissel Packing Co., supra, 395 U.S. at 613-614, 89 S.Ct. at 1940, quoting NLRB v. S.S. Logan Packing Co., 4 Cir. 1967, 386 F.2d 562, 570. Second, where the employer unfair labor practices are less pervasive, the Board, to protect employee free choice, must determine not only that a fair election is improbable but also 'that at one point the union had a majority.' NLRB v. Gissel Packing Co., supra, 395 U.S. at 614, 89 S.Ct. at 1940. Where the unfair labor practices have only a 'minimal impact on the election machinery,' a bargaining order is inappropriate. NLRB v. Gissel Packing Co., supra, 395 U.S. 615, 89 S.Ct. 1940.[10]
 
 
 10
 The Board found in the instant case not only that a bargaining order was required to combat Stevens' 'extensive and egregious unfair labor practices', but also that reliance on the authorization cards would better effectuate employee free choice than a rerun election[11] in the coercive atmosphere which obtained at the Stevens plant:
 
 
 11
 'The record reveals that upon learning of the presence of the Union, Respondent resorted to a campaign of extensive and egregious unfair labor practices in its efforts to thwart the Union's organizational drive. The timing of Respondent's unfair labor practices, commencing almost immediately after the organizational drive began and persisting until after the time of the election, persuades us that the unfair labor practices were calculated to, and in fact did dissipate the majority which the Union acquired between February 18 and March 18, 1968. In these circumstances we believe that a bargaining order is required to repair the effects of such unfair labor practices. For this reason, and also because Respondent's unfair labor practices were of such a nature as to make the erasure of their effects by traditional remedies and holding of a fair and coercion free rerun election improbable if not impossible, we are of the opinion and find that, on balance the rights of the employees and the policies of the act would better be effectuated by reliance on the employee sentiment as expressed in the authorization cards. Accordingly, as there is no question that the Union had been validly designated by a majority of the employees as their representative when the Union renewed its bargaining demand, we find that by refusing to honor the Union's bargaining demand and by engaging in the numerous unfair labor practices found by the Trial Examiner, Respondent violated Section 8(a)(5) and (1) of the Act, and that the policies of the Act will be effectuated by the imposition of a bargaining order to remedy the Respondent's refusal to bargain, as well as its other unfair labor practices herein found. N.L.R.B. v. Gissel Packing Company, 395 U.S. 575, (89 S.Ct. 1918 23 L.Ed.2d 547); Sinclair Company v. N.L.R.B., 395 U.S. 575 (89 S.Ct. 1918, 23 L.Ed.2d 547).'
 
 A.
 
 12
 In agreement with the Board we think that the present proceedings constitute one of those 'exceptional' cases marked by 'outrageous' and 'pervasive' unfair labor practices which, under Gissel, justify the issuance of a bargaining order despite the absence at one point of a Union-demonstrated majority. Stevens' intransigent recidivism is patent and overt. Denominating our case as Stevens VI in deference to historical accuracy, we note that neither the passage of time nor admonishments of judicial tribunals have caused the Company to alter its now all too familiar pursuance of full-scale war against unionization. Judge Brown's characterization in Stevens V is equally apt here:
 
 
 13
 'Stevens has been engaged in a massive multistate campaign to prevent unionization of its Southern plants. This campaign has involved numerous flagrant unfair labor practices including coercive interrogation, surveillance, threat of plant closings, and economic reprisals for Union activity. Moreover, the threats have been made good by extensive discriminatory discharges. As a result of these practices, several unfair charges have been brought before the Labor Board (see note 7 supra) and, except for slight variations, the orders of the Board have been enforced by two other Circuit Courts of Appeal in Stevens I, II and III and IV (see note 1 supra). As the Fourth Circuit said in assessing the company's conduct in Stevens III and IV, 'the Board properly took into consideration the unfair labor practices that Stevens I and II, disclosed, and we, in turn, cannot ignore this evidence. Maphis Chapman Corp. v. NLRB, 368 F.2d 298, 303 (4th Cir. 1966)'. Stevens III and IV at 1019 of 406 F.2d. Nor can we, in our subsequent turn, ignore the unfair labor practices disclosed in Stevens III and IV. To these we add the incidents and violations found by the Board to have occurred in the Georgia plants. Thus we assay the order in this atmosphere of persistent, long continued, flagrant violations occurring after and in spite of repeated declarations of illegality by Board and reviewing Courts.'J. P. Stevens & Co. v. NLRB, supra, 417 F.2d at 537.
 
 
 14
 In such an atmosphere the Board was warranted in finding that even if the Union never possessed a valid card majority, a bargaining order was appropriate to combat Stevens' anti-union conduct. The extensiveness of the unfair labor practices here would clearly support a finding that 'their coercive effects cannot be eliminated by the application of traditional remedies, with the result that a fair and reliable election cannot be had.' NLRB v. S.S. Logan Packing Co., supra, 386 F.2d at 570, quoted with approval in NLRB v. Gissel Packing Co., supra, 395 U.S. at 614, 89 S.Ct. 1918. Such practices, particularly the circumstances of the dismissals of three leading Union adherents and the campaign of blatant surveillance, interrogation, and threats are sufficient to bring this case within the pattern of other cases which have been deemed 'exceptional.' E.g., NLRB v. Gissel Packing Co., supra, 395 U.S. at 579, 89 S.Ct. 1918, aff'g NLRB v. Sinclair Co., 1 Cir. 1968, 397 F.2d 157; G.P.D., Inc. v. NLRB, 6 Cir. 1970, 430 F.2d 963; NLRB v. Wylie Mfg. Co., supra; see NLRB v. Lou De Young's Market Basket, Inc., 6 Cir. 1970, 430 F.2d 912.
 
 B.
 
 15
 Moreover, we hold that in any event the bargaining order here was justified because the Union did at one point demonstrate a card majority. We discussed this second classification of cases in NLRB v. American Cable Systems, Inc., supra, 414 F.2d at 668-669:
 
 
 16
 'Under the Gissel holding a bargaining order may issue where: (a) the union had valid authorization cards from a majority of the employees in an appropriate bargaining unit; (b) the employer's unfair labor practices, although not 'outrageous' and 'pervasive' enough to justify a bargaining order in the absence of a card majority, were still serious and extensive; (c) 'the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight; and (d) employee sentiment can best be protected in the particular case by a bargaining order.'
 
 
 17
 Stevens and the intervening employees argue, however, that the Union never had a valid authorization card majority. While admitting that as of March 18 the Union did possess enough employee signatures to constitute a numerical majority.[12] Stevens and the intervenors claim that sufficient numbers of these signatures were obtained by coercion or misrepresentation to vitiate the ostensible majority. In support of their contentions the Company and the individual intervenors append excerpts from the testimony of 92 Stevens' employees which, they claim, demonstrate conclusively the presence of misrepresentation and coercion.
 
 
 18
 The conflicting testimony in this case demonstrates that authorization cards are often a hazardous basis upon which to ground a union majority. Nevertheless, where employer unfair labor practices have undermined the reliability of the preferred method for determining employee sentiment, a Board-conducted election, reliance upon authorization cards may be necessary. In Gissel the Court recognized this fact:
 
 
 19
 'The acknowledged superiority of the election process, however, does not mean that cards are thereby rendered totally invalid, for where an employer engages in conduct disruptive of the election process, cards may be the most effective-- perhaps the only-- way of assuring employee choice.' NLRB v. Gissel Packing Co., supra, 395 U.S. at 60, 89 S.Ct. at 1934.
 
 
 20
 Where courts are forced to rely on authorization cards, of course, they must not be oblivious to the circumstances under which the cards were solicited. But where the cards are, as here, unambiguous on their face,[13] the circumstances must show clearly and convincingly that they were secured through coercion or misrepresentation before they may be disregarded. See Retail Store Employees Union Local 880 v. NLRB, 1969, 136 U.S.App.D.C. 27, 419 F.2d 329, 334. The Court in Gissel phrased the test as follows:
 
 
 21
 'In resolving the conflict among the circuits in favor of approving the Board's Cumberland rule, we think it sufficient to point out that employees should be bound by the clear language of what they sign unless that language is deliberately and clearly canceled by a union adherent with words calculated to direct the signer to disregard and forget the language above his signature. There is nothing inconsistent in handing an employee a card that says the signer authorizes the union to represent him then telling him that the card will probably be used first to get an election. Elections have been, after all, and will continue to be, held in the vast majority of cases; the union will still have to have the signatures of 30% Of the employees when an employer rejects a bargaining demand and insists that the union seek an election. We cannot agree with the employers here that employees as a rule are too unsophisticated to be bound by what they sign unless expressly told that their act of signing represents something else. In addition to approving the use of cards, of course, Congress has expressly authorized reliance on employee signatures alone in other areas of labor relations even where criminal sanctions hang in the balance, and we should not act hastily in desregarding congressional judgments that employees can be counted on to take responsibility for their acts.
 
 
 22
 'We agree, however, with the Board's own warnings in Levi Strauss, 172 N.L.R.B. No. 57, 68 L.R.R.M. 1338, 1341, and n. 7 (1968), that in hearing testimony concerning a card challenge, trial examiners should not neglect their obligation to ensure employee free choice by a too easy mechanical application of the Cumberland rule. We also accept the observation that employees are more likely than not, many months after a card drive and in response to questions by company counsel, to give testimony damaging to the union, particularly where company officials have previously threatened reprisals for union activity in violation of 8(a)(1). We therefore reject any rule that requires a probe of an employee's subjective motivations as involving an endless and unreliable inquiry.' 395 U.S. at 606-608, 89 S.Ct. at 1937.
 
 
 23
 The litany of testimony adduced by the Company, the individual intervenors, and the Board convinces us of the merit of refusing to rely on 'subjective motivations' and of viewing with a critical eye post-solicitation statements contrary to the language of the cards. See also NLRB v. American Art Indus., Inc., 5 Cir. 1969, 415 F.2d 1223, cert. denied, 397 U.S. 990, 90 S.Ct. 1122, 25 L.Ed.2d 397; NLRB v. American Cable Systems, Inc., supra, 414 F.2d at 665-667. Most of the testimony of the 92 employees proferred by the Company and the intervenors is hazy, imprecise, and contradicted by the testimony not only of Union solicitors but also of fellow employees.[14] See Amalgamated Clothing Workers of America v. NLRB, D.C. Cir. 1969, 420 F.2d 1296, 1301-1302; Retail Store Employees Union Local 880 v. NLRB, supra, 419 F.2d at 335. Other testimony, while perhaps producing a sharper conflict,[15] simply raises credibility choices which are within the province of the Trial Examiner and the Board to resolve. NLRB v. American Art Indus., Inc., supra, 415 F.2d at 1227. We therefore hold that the findings of the Board are supported by substantial evidence and conclude that as of March 18 the Union possessed a valid authorization card majority.
 
 
 24
 The fact that the Union held a valid authorization card majority on March 18, however, is not sufficient in itself to warrant the issuance of a bargaining order. In Gissel the Supreme Court noted that even if an employer committed serious unfair labor practices which might have dissipated a Union majority, the Board, in determining the propriety of a bargaining order, must make a contemporaneous judgment.
 
 
 25
 'If the Board finds that the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards, would, on balance, be better protected by a bargaining order, then such an order should issue.' 395 U.S. at 614-615, 89 S.Ct. at 1940. See also NLRB v. American Cable Systems, Inc., 5 Cir. 1970, 427 F.2d 446.
 
 
 26
 In short, since a Board-conducted election is the preferred mode of determining employee sentiment, the Board should approach the bargaining order remedy with some caution. The touchstone is the protection of employee free choice. If, at the time of the Board proceedings, the conditions at the plant are such that a fair election is probable, the Board should not issue a bargaining order. But if the Board determines that the effects of the employer unfair labor practices make a fair election improbable, it should order the employer to bargain on the basis of employee sentiment expressed in the authorization cards. As we stated the matter in American Cable:
 
 
 27
 'Gissel does not apply a nunc pro tunc principle, giving the then sins of the Company a now application. It requires contemporaneity-- a present view, albeit with an historical prospective. Industrial democracy should be allowed to work its will if the present conditions are sufficiently antiseptic for an election. On the other hand, if the employer's 1965 violations of 8(a)(1) and (3) have a 1970 existence, Gisscl commands the issuance of a bargaining order. * * *' NLRB v. American Cable Systems, Inc., supra, 427 F.2d at 449.
 
 
 28
 The Company and the individual intervenors here argue that since 117 Stevens' employees now intervene and urge an election, employee free choice would be thwarted by ordering Stevens to bargain with a now rejected Union. The Board, on the other hand, contends that this employee recantation is simply evidence of the continuing presence of the polluting effects of Stevens' unfair labor practices. We agree with the Board.
 
 
 29
 Many of those employees who now intervene on behalf of the Company were active union adherents during the organizational drive. We think that the Board could find in its expert judgment that their subsequent recantation was simply a product of Stevens' unlawful conduct. The anti-union history of Stevens and the extensive unfair labor practices chronicled in this case provide substantial evidence for such a conclusion. It would be a hardy employee indeed who would risk discharge or a plant shutdown by actively and overtly supporting the Union. Since the 1968 unfair labor practices continued to have a 1969 vitality, the time the Board entered its order, the Board was justified in determining that a fair election was improbable and that a bargaining order was required.[16] See Ace-Alkire Freight Lines, Inc. v. NLRB, 8 Cir. 1970, 431 F.2d 280, 284; G.P.D., Inc. v. NLRB, supra; NLRB v. Lou De Young's Market Basket, Inc., supra, 430 F.2d at 915; NLRB v. Wylie Mfg. Co., supra, 417 F.2d at 195-196.
 
 
 30
 We realize that as a result of the employer unfair labor practices the Union has not been able to retain its majority status. The Board, therefore, is in one sense imposing a minority Union on the majority of Stevens' employees. The Supreme Court in Gissel, however, clearly addressed this issue and resolved it in favor of the Board:
 
 
 31
 'Remaining before us is the propriety of a bargaining order as a remedy for a 8(a)(5) refusal to bargain where an employer has committed independent unfair labor practices which have made the holding of a fair election unlikely or which have in fact undermined a union's majority and caused an election to be set aside. We have long held that the Board is not limited to a cease-and-desist order in such cases, but has the authority to issue a bargaining order without first requiring the union to show that it has been able to maintain its majority status. See NLRB v. Katz, 369 U.S. 736, 748, n. 16, 82 S.Ct. 1107, 1114, 8 L.Ed.2d 230, 239 (1962); NLRB v. P. Lorillard Co., 314 U.S. 512, 62 S.Ct. 397, 86 L.Ed. 380 (1942). And we have held that the Board has the same authority even where it is clear that the union, which once had possession of cards from a majority of the employees, represents only a minority when the bargaining order is entered. Franks Bros. Co. v. NLRB, 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020 (1944). We see no reason now to withdraw this authority from the Board. If the Board could enter only a cease-and-desist order and direct an election or a rerun, it would in effect be rewarding the employer and allowing him 'to profit from (his) own wrongful refusal to bargain,' Frank Bros., supra, at 704 (64 S.Ct. at 818), 88 L.Ed. at 1023, while at the same time severely curtailing the employees' right freely to determine whether they desire a representative. The employer could continue to delay or disrupt the election processes and put off indefinitely his obligation to bargain; and any election held under these circumstances would not be likely to demonstrate the employees' true, undistorted desires.
 
 
 32
 'The employers argue that the Board has ample remedies, over and above the cease-and-desist order, to control employer misconduct. The Board can, they assert, direct the companies to mail notices to employees during plant time and to give the union access to employees during working time at the plant, or it can seek a court injunctive order under 10(j) (29 USC 160(j)) as a last resort. In view of the Board's power, they conclude, the bargaining order is an unnecessarily harsh remedy that needlessly prejudices employees' 7 rights solely for the purpose of punishing or restraining an employer. Such an argument ignores that a bargaining order is designed as much to remedy past election damage[32] as it is to deter future misconduct. If an employer has succeeded in undermining a union's strength and destroying the laboratory conditions necessary for a fair election, he may see no need to violate a cease-and-desist order by further unlawful activity. The damage will have been done, and perhaps the only fair way to effectuate employee rights is to re-establish the conditions as they existed before the employer's unlawful campaign.
 
 
 33
 'There is, after all, nothing permanent in a bargaining order, and if, after the effects of the employer's acts have worn off, the employees clearly desire to disavow the union, they can do so by filing a representation petition. For, as we pointed out long ago, in finding that a bargaining order involved no 'injustice to employees who may wish to substitute for the particular union some other * * * arrangement,' a bargaining relationship 'once rightfully established must be permitted to exist and function for a reasonable period in which it can be given a fair chance to succeed,' after which the 'Board may, * * * upon a proper showing, take steps in recognition of changed situations which might make appropriate changed bargaining relationships.' Frank Bros., supra, at 705-706 (64 S.Ct. at 819), 88 L.Ed. at 1023,'
 
 
 34
 395 U.S. at 610-613, 89 S.Ct. at 1938-1940.
 
 
 35
 Still it might be argued that many of the recantations were not the product of Stevens' unlawful conduct. There may be employees who, uncoerced by the Company's unfair labor practices, now reject the Union. Employee free choice for them would best be served by an election. But the Board's evaluation of the propriety of a bargaining order cannot be based on employee motivations, determined individual by individual. We cannot require the Board to engage in the hopeless and impossible task of evaluating the subjective reasons for each employee recantation. The Board must, on the objective facts, determine the seriousness of the employer unfair labor practices and consider the possibility of a fair rerun election. Note, NLRB v. Gissel Packing Co.: Bargaining Orders and Employee Free Choice, 45 N.Y.U.L.Rev. 318 (1970). Once the Board has done so, if supported by substantial evidence, its bargaining order must be enforced. Since we have found that the Board's conclusions are indeed amply supported by the record, we also enforce that portion of its order requiring Stevens to bargain with the Union.
 
 IV.
 
 36
 In No. 29,037 the Union asks us to remand the case to the Board for the imposition of more meaningful and farreaching remedies than those ordered. As we noted earlier the Board's order, which we have enforced in full, requires the Company to cease and desist from its unfair labor practices, to employ the discriminatees and make them whole, to bargain with the Union, and to post appropriate notices. Such an order is clearly traditional for the unfair labor practices found here. In addition the Board ordered, and we enforce, certain supplemental remedies which have become traditional for Stevens' plants. See NLRB v. J. P. Stevens & Co., supra, 417 F.2d at 534-535. The Company is ordered to convene its Statesboro employees and read them the Board's notice during working time, to mail a copy of that notice to each Statesboro employee, and to grant the Union reasonable access to its bulletin boards for a period of one year. The Union complains of the Board's failure to provide the following additional remedies:
 
 
 37
 '(1) furnish the Union with the names and addresses of all employees in the Company's plants in North Carolina, South Carolina and Georgia; (2) post notices in all of the aforementioned plants; (3) permit a Union representative to enter these plants for the purpose of delivering a one hour speech to employees on the advantages of union membership; (4) furnish the Union with the job classifications, wage rates and seniority lists for all employees in the Company's Statesboro, Georgia plant; and (5) make whole all employees in the appropriate unit at the Statesboro plant for those contractual benefits which would have accrued to them had the Company not unlawfully refused to bargain, and had a collective bargaining agreement been consummated.'
 
 
 38
 The Union acknowledges that there is a presumption that favors the Board, with its expertise, in its selection of remedies. As we noted in Stevens V:
 
 
 39
 'In determining whether a particular affirmative action ordered by the Board pursuant to its powers under 10(c), 28 U.S.C.A. 160(c), is appropriate, the reviewing Court must pay an unusually high degree of respect to the Board's conclusion-- these remedies are 'peculiarly a matter of administrative competence.' Fibreboard Paper Products Corp. v. NLRB, 1964, 379 U.S. 203, 216, 85 S.Ct. 398, 406, 13 L.Ed.2d 233, 241. In Virginia Electric & Power Co. v. NLRB, 1943, 319 U.S. 533, 63 S.Ct. 1214, 87 L.Ed. 1568, the Supreme Court stated it in stringent terms: '(The order) should stand unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act.' at 319 U.S. 540, 63 S.Ct. 1218, 87 L.Ed. 1574. Fresh emphasis on the peculiar respect due Board determination of remedies has been given by the Supreme Court in NLRB v. Gissel Packing Co., Inc., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547:
 
 
 40
 'It is for the Board and not the Courts * * * to make (the) determination (of remedies), based on its estimates as to the effects on the election process of unfair labor practices of varying intensity. In fashioning its remedies under the broad provisions of 10(c) of the Act * * * the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing Courts.' at 395 U.S. 612, 89 S.Ct. 1939, 23 L.Ed.2d 577, n. 32.
 
 
 41
 'And, in upholding a Board's order compelling the payment of fringe benefits as a part of the remedy for a 8(a)(5) violation, the Court said of 10(c) this 'grant of remedial power is a broad one.' NLRB v. Strong, 1969, 393 U.S. 357, 89 S.Ct. 541, 21 L.Ed.546.'
 
 
 42
 417 F.2d at 537-538.
 
 
 43
 The Board's discretion, of course, is not unlimited. Thus, under section 10(c)'s 'affirmative action' mandate there may be cases where the Board has gone too far. See, e.g., H. K. Porter Co. v. NLRB, 1970, 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146. Conversely, there may also be cases where the Board has not gone far enough. See, e.g., Food Stores Employees Union Local 347 v. NLRB, D.C. Cir. 1970, 433 F.2d 541; International Union of Electrical Radio & Machine Workers v. NLRB, 1970, 138 U.S.App.D.C. 249, 426 F.2d 1243. Considering the plethora of Stevens' cases before the Board and the courts, we are convinced that, to the Company, the words of judicial and administrative admonition are as but 'sounding brass or a tinkling cymbal.' The Board is therefore under an obligation to devise some meaningful affirmative action to counter the Company's known predisposition to violate the Act. The record in this case, however, reveals just such an effort by the Board. There has been over the years a careful tailoring of remedies to meet the peculiar problems posed at the Stevens' plants. The Union in effect argues that the Board could have done better. That judgment, however, unless there has been an abuse of discretion, is left for the Board. Finding no such abuse, we reject the Union's plea and enforce the order as it stands, praying that there will be no Stevens VII.
 
 
 44
 The Board's order is enforced.
 
 
 45
 AINSWORTH, Circuit Judge (specially concurring):
 
 
 46
 I concur in the enforcement of the Board's order in this case, though not without some misgivings as to the propriety here of the Board's issuance of a bargaining order without a rerun election.
 
 
 47
 When the Union was unsuccessful in the original election by a vote of 198 to 110 against representation, the Regional Director set the election aside and ordered second election, for failure of the Company to supply a list of names and addresses as required by N.L.R.B. in the 'Excelsior' case (156 N.L.R.B. 1236 (1966)). The second election, however, was not held because the Union in the meanwhile had filed an unfair labor charge under Section 8(a)(5) of the Act that the Company had unlawfully refused to bargain. After a hearing the Examiner, and later the Board, agreed that the charge against the Company should be sustained. A bargaining order was issued, without the holding of the second election, on the basis of an authorization card majority because of the Company's refusal to bargain and other unfair labor practices. The Board cited N.L.R.B. v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918 (1969) as authority for its order.
 
 
 48
 In the proceeding before the Board, 117 employees of the Company intervened in the representation part of the hearing, contending that they signed the authorization cards on Union representations that they were signing to get an election, and that the cards could not properly be considered as authorizing collective bargaining. Ninety-two employee witnesses then testified substantially to this effect, putting at issue the question of whether the Union ever had a card majority. The 3 Union organizers also testified and denied any misrepresentations in obtaining the cards. The Examiner credited the Union witnesses but declined to believe the employee witnesses.
 
 
 49
 The evidence was, therefore, in sharp conflict, but in the absence of some unusual circumstance, we are obliged to accept the Board's findings (sustaining the Examiner) even if another choice might have been made had the matter been before us de novo. See N.L.R.B. v. Monroe Auto Equipment Company, 5 Cir., 1968, 392 F.2d 559, 560-561, cert. denied, 393 U.S. 934, 89 S.Ct. 293, 21 L.Ed.2d 270.
 
 
 50
 Board policy in representation cases favors the holding of elections-- in secret-- as the most satisfactory and preferred method of ascertaining whether a Union has majority support. See Gissel, supra, 395 U.S. at 605, 89 S.Ct. at 1934 (1969). It is obvious that such an election is better than the controversial and less reliable card authorization method.
 
 
 51
 It is arguable, however, whether laboratory conditions, insuring fairness and impartiality, could be had at a rerun election. But under all the facts and circumstances here, including the sharp conflict in the evidence and the recantation of a large number of employees of the cards they signed, such an election could be the best solution here. Then the troublesome question of whether the Board is imposing a minority Union on the majority of the Company's imployees could be settled. Nevertheless, using the procedure approved by the Supreme Court in Gissel, the Board has issued a bargaining order without an election 'and its choice of remedy must therefore be given special respect by reviewing courts.' See Gissel, supra, 395 U.S. at 612, 89 S.Ct. at 1939 n. 32.
 
 
 52
 Since the Board's order is supported by substantial evidence, though conflicting, and our review is limited to a determination as to whether there is substantial evidence to support the Board's findings, I have resolved the matter in favor of the Board's decision and concur in enforcement of its order.
 
 
 
 [1]
 There is some indication that the Company disputes the Board's finding that the Union renewed its recognitional demand on these two dates. The Board's conclusion, however, is supported by substantial evidence
 
 
 [2]
 In Excelsior Underwear, Inc., 156 N.L.R.B. 1236 (1966), the Board held that an election may be set aside if a company refuses to provide to a petitioning union an address list of all company employees. The Supreme Court recently upheld the validity of the Excelsior rule in NLRB v. Wyman-Gordon Co., 1969, 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709
 
 
 [3]
 It is now clear that even though a union has requested a Board election, it is not precluded from obtaining recognition, following its election defeat, through the unfair labor practice procedure. NLRB v. Gissel Packing Co., 1969, 395 U.S. 575, 615 n. 34, 89 S.Ct. 1918, 23 L.Ed.2d 547, citing with approval Bernel Foam Prods. Co., 146 N.L.R.B. 1277 (1964)
 
 
 [4]
 Section 8(a)(1), 29 U.S.C.A. 158(a)(1), provides:
 '(a) It shall be an unfair labor practice for an employer--
 (1) To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;'
 Those section 7 rights guaranteed by section (8)(a)(1) are set forth in 29 U.S.C.A. 157:
 'Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a)(3).'
 
 
 [5]
 Section 8(a)(3), 29 U.S.C.A. 158(a)(3), provides in relevant part as follows:
 '(a) It shall be an unfair labor practice for an employer--
 (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * *.'
 
 
 [6]
 Section 8(a)(5), 29 U.S.C.A. 158(a)(5), provides:
 '(a) It shall be an unfair labor practice for an employer--
 (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.'
 
 
 [7]
 The Board ordered Stevens (1) to cease and desist from the unfair labor practices found; (2) to make each employee or employee applicant whole for any loss of earnings resulting from discriminatory actions; (3) to offer full and immediate reinstatement to the three employees discriminatorily discharged; (4) to offer employment to the employee applicant whom Stevens discriminatorily refused to hire; (5) to grant the Union access to bulletin boards for a one-year period; (6) to post appropriate notices, mail a copy to each employee, and have a company official read the notice to the employees. These remedies are quite similar to those ordered in an earlier Stevens case, J. P. Stevens & Co. v. NLRB, 5 Cir. 1969, 417 F.2d 533
 
 
 [8]
 This language is borrowed from Chief Judge Brown's characterization of Stevens' conduct in an earlier case, J. P. Stevens & Co. v. NLRB, supra, 417 F.2d at 536
 
 
 [9]
 NLRB v. Gissel Packing Co., supra, 395 U.S. at 614, 89 S.Ct. 1918; see note 4 supra
 
 
 [10]
 In what has been termed its 'famous footnote eighteen', Christensen & Christensen, of Unions Under the NLRA, 37 U.Chi.L.Rev. 411, 423 (1970), the Supreme Gissel Packing and 'Good Faith Doubt': The Gestalt of Required Recognition of Unions Under the NLRA, 37 U.Chi.L.Rev. 411, 423 (1970), the Supreme Court in Gissel was careful to emphasize that it was not deciding 'whether a bargaining order is ever appropriate in cases where there is no interference with the election process' by independent unfair labor practices. 395 U.S. at 595, 601 n. 18, 89 S.Ct. at 1930. In short, Gissel simply constituted an approval of Board-compelled bargaining in instances where recourse to a ballot is made impossible by employer misconduct. It did not delineate the precise scope of the duty to bargain imposed by section 8(a)(5), or the limits of the Board's power to enforce that duty through bargaining orders, when an employer is confronted by an authorization card majority and does not commit independent unfair labor practices. Christensen & Christensen, supra, at 424; see NLRB v. American Cable Systems, Inc., 5 Cir. 1969, 414 F.2d 661, 668 n. 5. The logic of the opinion, therefore, views the bargaining order in situations such as the instant case not as an enforcement of a duty to bargain, but as a remedy for employer coercive practices
 Nevertheless, the Board here has ordered Stevens to bargain not only as a remedy for violations of section 8(a)(1) and section 8(a)(3) but also as a remedy for a violation of section 8(a)(5). The Board's reasoning is sanctioned by Gissel, for the Court there approved current Board practice which holds that when an employer's unfair labor practices have destroyed the accuracy of the election process as a barometer of employee opinion, the employer's subsequent refusal to negotiate becomes a section 8(a)(5) violation, 395 U.S. at 594, 89 S.Ct. 1918.
 Since we find that the bargaining order here was justified under both special circumstances outlined in Gissel, we must also approve the Board's conclusion that Stevens violated section 8(a)(5). But such post-decision labeling adds little to what we deem the proper analysis of this case: whether, as a remedy for Stevens' violations of section 8(a)(1) and section 8(a)(3), a bargaining order is preferable to a Board-conducted election. See Note, The Supreme Court, 1968 Term, 83 Harv.L.Rev. 7, 247-52 (1969); cf. NLRB v. Wylie Mfg. Co., 10 Cir. 1969, 417 F.2d 192, 196, cert. denied, 397 U.S. 913, 90 S.Ct. 915, 25 L.Ed.2d 94.
 
 
 [11]
 Stevens and the intervening employees argue that a bargaining order is inappropriate since the election which the Union lost was never set aside because of any unfair labor practices. The Board's Regional Director set aside the election because of Stevens' refusal to supply an Excelsior list and thus found it 'unnecessary to consider' the Union's other objections, including the allegation that unfair labor practices made the election invalid. This disposition had a practical basis, for it vitiated the necessity for a long evidentiary hearing. It did not preclude the Board from subsequently finding, as it did, that
 'the timing Respondent's (Stevens) unfair labor practices, commencing almost immediately after the organizational drive began and persisting until after the time of the election, persuades us that the unfair labor practices were calculated to, and in fact did dissipate the majority which the Union acquired between February 18 and March 18, 1968.'
 Stevens' and the intervening employees' contentions are, therefore, without merit. Moreover, a finding that an election has been set aside because of employer unfair labor practices may not always be a prerequisite to the issuance of a bargaining order. While Gissel requires that the Board determine that employer unfair labor practices have made a fair election improbable, that requisite finding looks predominantly to the future. The fact that an election has been set aside for reasons other than pre-election unfair labor practices-- for example, for failure to supply the Excelsior list-- does not necessarily mean that a fair rerun election may be held. Post-election unfair labor practices may also destroy laboratory conditions. If so, the Board must then determine whether a bargaining order, despite an absence of majority support, is more appropriate than a rerun election under prevailing coercive conditions. See NLRB v. Drives, Inc., 7 Cir. 1971, 440 F.2d 354; cf. Independent, Inc. v. NLRB, 5 Cir. 1969, 406 F.2d 203, 207-208.
 
 
 [12]
 The Board adopted the Trial Examiner's finding that while in February, at the time of the first recognitional demand, the Union did not possess a card majority, it had established majority support by March. Thus, on March 18, 1968, the Examiner found that the Union had secured 224 valid authorization cards from a unit consisting of 343 employees. On April 20, 1968, when an additional recognitional demand was made, the Examiner found that the Union had secured 222 valid authorization cards from a unit consisting of 326 employees
 
 
 [13]
 Each card read as follows:
 'Textile Workers Union of America Affiliate of the AFL-CIO and CLC
 I hereby join with my fellow workers at the mill in organizing a union to better our conditions of life and secure economic justice, as is my right under the laws of the United States. To this end I declare that the Textile Workers Union of America, AFL-CIO and CLC, shall be any representative in collective bargaining over wages, hours and all other conditions of employment. I make this pledge of my own free will in the conviction that the united action of all workers through union of their own choosing is the way to achieve the liberty of the individual for the benefit of all.
 In addition, these cards had a place for the employee's signature, the date, job description information, and the employee's address.
 A second type of authorization card distributed by the Union read as follows:
 Textile Workers Union of America Affiliate of the AFL-CIO and CLC
 I hereby accept membership in the Textile Workers Union of America of my own free will and do hereby designate said Textile Workers Union of America as my representative for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment of other conditions of employment.'
 In addition these cards had spaces for the employee's signature, job description, date, and employee's address.
 
 
 [14]
 For example, many of these cards were solicited at Union meetings held on February 12 and February 15, 1968. The Trial Examiner, relying on the testimony of Union Representative McIver and numerous employees, found that at those meetings McIver told the employees that the Union would first ask for recognition and that, only afterwards, if the Company refused to grant recognition, would the cards be used for an election. Much of the opposition testimony proves no more than that an election was mentioned at the meetings. But as the Supreme Court clearly held in Gissel, mere mention that the cards may be used to secure an election is not sufficient to vitiate their efficacy. Such cards can be disregarded only where Union organizers solicit them on the explicity or indirectly expressed representation that they will use such cards only for an election. NLRB v. Gissel Packing Co., supra, 395 U.S. at 607-608, 89 S.Ct. 1918 & n. 27
 
 
 [15]
 Most of this testimony concerns those cards solicited by Union organizers on the access road outside the plant and those cards solicited by employee adherents of the Union
 
 
 [16]
 The relevant time-period for making such a determination is when the matter is before the Board for remedial action-- October, 1969, in the instant case. If a bargaining order is deemed appropriate at that time, the court should not reconsider the matter as of the date it is before it for enforcement. Thus, in NLRB v. L. B. Foster Co., 9 Cir. 1969, 418 F.2d 1, 4, cert. denied, 397 U.S. 990, 90 S.Ct. 1124, 25 L.Ed.2d 398, the court stated:
 'We do not think that these facts permit us to refuse to enforce the Board's order. The delay is not the fault of the union; if it is anyone's fault, it is that of the employer. But regardless of fault, it is an unfortunate but inevitable result of the process of hearing, decision and review prescribed in the Act. And to deny enforcement, with or without remand for reconsideration on the basis of facts occurring after the Board's decision, is to put a premium upon continued litigation by the employer; it can hope that the resulting delay will produce new set of facts, as to which the Board must then readjudicate. Suppose that the Board does so, and again finds against the employer. There can then be a petition to this court, a decision by it, and a petition for certiorari to the Supreme Court. By that time there will almost surely be another new set of facts. When is the process to stop?'
 See also NLRB v. South Bay Daily Breeze, 9 Cir. 1969, 415 F.2d 360, 367, cert. denied, 397 U.S. 915, 90 S.Ct. 919, 25 L.Ed.2d 96.
 Nothing we said in NLRB v. American Cable Systems, Inc., supra, 427 F.2d 446, is inconsistent with this proposition. In that case there was a remand to the Board in light of Gissel. We simply held that, at the time the Board reconsidered the propriety of a bargaining order on remand under Gissel standards, it was required to consider the then existing situation at the company to determine whether a fair election was still improbable. The Foster case was specifically distinguished on this ground. 427 F.2d at 448.