**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**KAISER AGRICULTURAL CHEMICALS, a DIVISION OF KAISER ALUMINUM & CHEMICAL CORPORATION, Respondent.**

No. 72–1379.

United States Court of Appeals, Fifth Circuit.

Feb. 2, 1973.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Washington, D. C., Walter C. Phillips, Director, Thaddeus R. Sobieski, Region 10, N. L. R. B., Atlanta, Ga., for petitioner.

John E. McFall, Andrew C. Partee, Jr., New Orleans, La., for respondent.

Before RIVES, WISDOM and RONEY, Circuit Judges.

WISDOM, Circuit Judge:

The National Labor Relations Board seeks enforcement of its order that the respondent, Kaiser Agricultural Chemicals, a division of Kaiser Aluminum &

Chemical Corporation, cease and desist from violating section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), and that it bargain collectively on demand with the International Brotherhood of Firemen & Oilers, AFL–CIO, as the exclusive representative of the employees in its production and maintenance unit. 187 NLRB No. 95. We grant enforcement.

## I.

Kaiser Agricultural Chemicals (the "company") maintains a plant at Bainbridge, Georgia, where it is engaged in the manufacture and sale of granular fertilizer and other agricultural chemicals. During September 1969, the International Brotherhood of Firemen & Oilers, AFL–CIO, (the "union") began its campaign to organize the 70 production and maintenance employees at the plant. Two union agents arranged for a meeting of the employees to be held October 24, 1969, at the Holiday Inn in Bainbridge. At the meeting, a substantial number of the employees were in attendance, and the union obtained 27 signed authorization cards. The cards stated that the employee authorized the union "to represent me and, in my behalf, to negotiate and conclude all Agreements as to hours of labor, wages, and other labor conditions." [1]

The following day, 19 more employees signed authorization cards. Having obtained cards from 46 of the 70 employees in the production and maintenance unit, the union advised the company by telegram on October 25 that a majority of the employees in the production and maintenance unit had signed cards designating the union as their collective bargaining representative. The union requested a meeting with the company for the purpose of negotiating a new labor agreement. In the next two days seven additional employees signed the cards, making a total of 53 authorizations of a possible 70.

On October 27, the union filed a representation petition with the National Labor Relations Board's regional office. The next day the company advised the union by letter that it would not grant recognition to the union; that it did not believe the union represented a majority of the employees in an appropriate unit; and that it preferred representation to be determined by a board-conducted election based on the petition filed by the union. On December 5, the board directed that an election be held among the company's production and maintenance employees on January 6 and 7, 1970.

Between October 24 and November 12, 1969, company supervisors engaged in certain conduct which later formed the basis for unfair labor practice complaints filed by the union. We present a brief outline of the relevant facts.

While the union's meeting at the Holiday Inn was still in progress on October 24, a company supervisor, Whidden, drove to the Holiday Inn parking lot to determine the number and identity of the company's employees attending the meeting. After the meeting some of the employees reported for work at midnight. A company supervisor, Johnson, approached an employee and asked him

---

1. The company does not contend that the cards were ambiguous or misleading. *See* Cumberland Shoe Corp., 1964, enforced, 6 Cir. 1965, 351 F.2d 917; NLRB v. Gissel Packing Co., 1969, 395 U.S. 575, 606–608, 89 S.Ct. 1918, 1936, 23 L.Ed.2d 547; NLRB v. American Cable Systems, 5 Cir., 1969, 414 F.2d 661. As the Supreme Court stated in *Gissel*:

> [E]mployees should be bound by the clear language of what they sign unless that language is deliberately and clearly canceled by a union adherent with words calculated to direct the signer to disregard and forget the language above the signature.

In the present case, the trial examiner concluded that "no testimony was adduced to establish . . . that the authorization cards were anything other than what appears on the face of the cards, namely an unconditional authorization of the Union to act as the collective bargaining representative of the card signer."

what his car was doing at the Holiday Inn that night. When the employee denied being there, Johnson replied "Oh, come on, I knew [your car] was out there." When the employee admitted being at the meeting and asked Johnson how he knew about it, Johnson replied that he had known about the meeting for some time. The same night, Johnson also questioned another employee about his attendance at the meeting. When the employee asked what meeting Johnson was referring to, Johnson replied "The meeting you had at the Holiday Inn," and stated that he knew for a month or two that the employees were going to have a meeting.

During the day of the October 24 meeting and the period immediately thereafter, company supervisors spoke to employees about the union on several occasions. Supervisor Whidden told employees that if the union came in and asked for an increase in wages, a strike would follow that the company was "prepared to take." Noting that the employees would be out of work, Whidden asked one employee how he would be able to make payments on his new house, and asked another how he would be able to make payments on his new automobile. Supervisor Swicord asked an employee if he had signed an authorization card and told him that the union would not do any good because the company would not increase wages and that if the union were voted in the company might have to close the granulation plant.

On another occasion, the company's production superintendent, Smith, approached an employee and stated that if the union came in, bargaining for employee benefits would start "at zero," that other existing benefits would be

discontinued, and that the granulation plant would have to be shut down.

Between November 1 and 10, supervisors Johnson, Smith, and Swicord approached several employees and stated that if the union came in, the granulation plant would be shut down and run by supervisors, that the company was prepared to take a strike, that bargaining for employee benefits would begin "at zero," that the employees would lose retirement and other existing benefits, and that the practice of permitting employees to swap shifts would be discontinued. The plant manager, Montee, also told an employee that if the union demanded benefits over what was then in effect, the company would resist and take a strike. Whitaker, vice-president of the company, told an employee that the company definitely did not want a union; that the company had orders from the home office that no raises would be granted if the union were brought in; and that if a raise was requested they would close down the plant.

On November 4, the union filed with the board an unfair labor practice charge alleging that the company had violated section 8(a)(1) of the Act by interfering with the employees' rights under section 7, 29 U.S.C. § 157.[2] After an investigation, the board's regional director issued a complaint against the company in case no. 8026.

On January 6 and 7, 1970, the representation election was held, resulting in a vote of 12 to 25 against the union. The union made timely objections to the company's conduct affecting the election in case no. 8013. On February 3, the union filed additional charges, amended February 16, alleging that the company unlawfully refused to bargain in viola-

2. Section 7 provides:
   Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a)(3). 29 U.S. C. § 157.

tion of section 8(a)(5), 29 U.S.C. § 158(a)(5). The regional director investigated and on February 20 issued a complaint based on these charges in case no. 8153.

On February 12, 1970, the board's regional director ordered the election set aside and directed a second election. On a request by the company to review the regional director's decision, the board ordered a hearing on both the unresolved objections to the election (case no. 8013) and the pending cases involving unfair labor practice charges (case nos. 8026 and 8153). After examining the complaints filed by the union, the trial examiner found that the company had violated section 8(a)(1) of the Act by maintaining surveillance of the union's meeting on October 24; by giving the impression that union activities of the employees were under surveillance by the company; by coercively interrogating its employees about their union activities; by threatening to curtail or eliminate plant operations if the employees selected a union as their bargaining representative; and by threatening that if the union won the election, the company would revoke existing benefits, force the union to bargain "from

zero," and would "take a strike" if the union asked for wage increases. The trial examiner found that a substantial proportion of the unfair labor practices occurred between October 27, the date the representation petition was filed, and January 6 and 7, the dates the election was held,[3] and that the election was improperly interfered with and had to be set aside. In addition, the trial examiner found that the union represented the majority of employees in an appropriate unit when the request for recognition was made on October 25; that the possibility of holding a free and fair rerun election was unlikely because of the lingering effects of the unfair election practices; and that the company's refusal to bargain with the union violated section 8(a)(5) of the Act.

The board adopted the trial examiner's findings and ordered the company to cease and desist from its unfair labor practices or from interfering in any other manner with the employees' exercise of their rights under the Act. Finally, the board required the company to bargain collectively with the union on demand as the exclusive representative of its employees and to post appropriate notices.[4]

---

3. In determining whether an election should be set aside the board will consider only conduct occurring on or after the date of filing of the representation petition. Ideal Electric Co., 1961, 134 N.L.R.B. 1275; Independent, Inc. v. NLRB, 5 Cir. 1969, 406 F.2d 203, 207. Pre-filing employer misconduct, however, may be considered in determining whether a bargaining order is appropriate.

4. The board's order states, in pertinent part, that the company shall cease and desist from:

(a) Refusing, upon request, to bargain collectively with INTERNATIONAL BROTHERHOOD OF FIREMEN & OILERS, AFL–CIO, as the exclusive collective-bargaining representative of its employees in an appropriate unit.

\*     \*     \*     \*     \*

(b) Engaging in surveillance of the union activities of its employees, or in any conduct from which such employees may reasonably infer that their union activities are under its surveillance.

(c) Interrogating employees with respect to their attendance at union meetings; as to whether or not they had signed union cards; or whether they were in favor of a union.

(d) Threatening to curtail or eliminate plant operations if the employees select a union as their bargaining representative.

(e) Reducing or eliminating privileges enjoyed by employees, if they selected a union as their bargaining representative.

(f) Telling employees that if a union becomes their bargaining representative and requests increased wages, the employees would have to strike to obtain such increase.

(g) Threatening employees that if they select union representation, existing employee benefits would be reduced to zero, and that bargaining would start from "scratch."

(h) Threatening employees with loss of employer contributions to a retire-

## II.

The company's first contention is that the board's finding that the company violated section 8(a)(1) of the Act is not supported by substantial evidence. The record reveals, however, that the company engaged in a campaign of "classic, albeit crude, unlawful labor practices" designed to dissipate support for the union. J. P. Stevens & Co. v. NLRB, 5 Cir. 1969, 417 F.2d 533, 536.

The company maintained surveillance over the union's October 24 meeting for the purpose of determining the number and identity of the employees attending and fostered an impression that the union activities of the employees were under surveillance. NLRB v. Central Power and Light Co., 5 Cir. 1970, 425 F.2d 1318; NLRB v. Southland Paint Co., 5 Cir. 1968, 394 F.2d 717, 719–720; NLRB v. Borden Co., 5 Cir. 1968, 392 F.2d 412; Hendrix Mfg. Co. v. NLRB, 5 Cir. 1963, 321 F.2d 100. Company supervisors interrogated employees about their union activities in a manner that was coercive and intimidating. J. P. Stevens & Co., Inc., Gulistan Division v. NLRB, 5 Cir. 1971, 441 F.2d 514, cert. denied 404 U.S. 830, 92 S.Ct. 69, 30 L.Ed.2d 59; NLRB v. Varo, Inc., 5 Cir. 1970, 425 F.2d 293; Ridgewood Management Co. v. NLRB, 5 Cir. 1969, 410 F.2d 738, cert. denied 396 U.S. 832, 90 S.Ct. 87, 24 L.Ed. 83. The surveillance and the intimidating interrogation necessarily had a continuing effect on the employees.

The company threatened to curtail or close down plant operations if the employees chose a union as their bargaining representative. J. P. Stevens & Co., Inc., Gulistan Division v. NLRB, *supra*; NLRB v. Varo, Inc., *supra*; NLRB v. Standard Forge and Axle Co., 5 Cir. 1969, 420 F.2d 508; Textile Workers v. Darlington Mfg. Co., 1965, 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827. The company also threatened to revoke existing benefits if the union won the election and stated that the union would have to start "from zero" in the negotiations. Hendrix Mfg. Co. v. NLRB, *supra*; Surprenant Mfg. Co. v. NLRB, 6 Cir. 1965, 341 F.2d 756.

Finally, the company stated that it would take a strike if the union asked for wage increases. The board found that these statements were not only a threat that the employees would have to strike to obtain any improvement in wages, but were intended to make the employees realize the futility of electing a union. Yazoo Valley Electric Power Ass'n., 163 NLRB 777, enf'd in relevant part, 5 Cir. 1968, 405 F.2d 479; Dryden Mfg. Co., 174 NLRB 255, enf'd in relevant part, 5 Cir. 1970, 421 F.2d 267.

The company contends that its supervisors' statements were merely predictions of the possible economic consequences of unionization and did not constitute violations of the Act. An employer, of course, is not relegated to silence during the course of an election campaign but may communicate his views as to the effects of unionization in general or in a particular plant. Indeed, the Act contemplates an expression of views by both the employer and the union in order to promote an informed choice by employees. The employer must insure, however, that such expression "contains no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c). In determining whether the facade of economic prediction is being used to veil a threat of economic reprisal, the board must focus on both the content of the employer's remarks and the context in which those remarks are

---

ment fund for their benefit, if they select a union to represent them.

(i) In any other manner interfering with, restraining or coercing employees in the exercise of their rights to self-organization, to form, join or assist labor organizations, to bargain collective-

ly through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, or to refrain from any and all such activities.

\*     \*     \*     \*     \*

made. The question is not only what the employer intended to imply but also what the employees could reasonably have inferred. Hendrix Manufacturing Co., Inc. v. NLRB, *supra*; NLRB v. Harbison-Fischer Mfg. Co., 5 Cir. 1962, 304 F.2d 738; NLRB v. Griggs Equipment Co., Inc., 5 Cir. 1962, 307 F.2d 275. The scope of inquiry must encompass the entire pattern of employer conduct. Remarks that may not appear coercive when considered in isolation may take on a different meaning when evaluated with respect to the totality of the circumstances.[5] The cumulation of such remarks, relatively innocuous in themselves, may create an atmosphere in which employee free choice is rendered impossible. NLRB v. Sinclair Co., 1 Cir. 1968, 397 F.2d 157, aff'd sub nom., NLRB v. Gissel Packing Co., 1969, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547; NLRB v. Kolmar Laboratories, 7 Cir. 1967, 387 F.2d 833.

Economic predictions by employers are particularly susceptible to abuse. As the Supreme Court has stated, an employer's economic predictions must be "carefully phrased on the basis of objective fact to convey [a] belief as to demonstrably probable consequences beyond his control . . . . If there is any implication that an employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only to him, the statement is no longer a reasonable prediction based on available facts but a threat of retaliation based on misrepresentation and coercion . . . ." NLRB v. Gissel Packing

Co., *supra*, 395 U.S. at 618–619, 89 S.Ct. at 1942.

In the case at bar, the board determined that the company supervisors' statements to employees were not isolated or innocent but were part of a campaign to dissipate the union majority. Rather than expressing predictions of demonstrable economic consequences, the supervisors cited a litany of horrors, including strikes, plant closings, and loss of benefits, that would result if the employees chose the union as their bargaining representative. The employees could reasonably have inferred that these events would result not from the inevitable forces of the market, but from the deliberate acts of the company taken in reprisal. The message was clear: If the union came in, existing benefits would go; no wage increases would be granted; resistance would be futile. The board found that the effect of the supervisors' conduct was to induce fear as to the consequences of the employees' union activities. Since an examination of the record indicates that substantial evidence supports these findings, we conclude that the board's decision that the company violated section 8(a)(1) must be upheld. Universal Camera Corp. v. NLRB, 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

### III.

The company's second contention is that the board abused its discretion in issuing a bargaining order rather than directing another election. At the outset, we note that the board has broad powers in fashioning a remedy under

---

5. In NLRB v. Kropp Forge Co., 7 Cir., 1949, 178 F.2d 822, 828–829, cert. denied, 340 U.S. 810, 71 S.Ct. 36, 95 L.Ed. 595, the court stated:

   A statement . . . might seem . . . perfectly innocent . . . including neither a threat nor a promise but, when the same statement is made by an employer to his employees, and we consider the relation of the parties, the surrounding circumstances, related statements and events and the background of the employer's actions, we may find that the statement is a part of a general pattern which discloses action by the employer so coercive as to entirely destroy his employees' freedom of choice and action. . . . If, when so considered, such statements form a part of a general pattern or course of conduct which constitutes coercion and deprives the employees of their free choice guaranteed by Section 7, such statements must still be considered as a basis for finding an unfair labor practice.

section 10(c) to effectuate the policy of the Act. 29 U.S.C. § 160(c). The close relationship between labor policy and choice of remedy, coupled with the board's competence and expertise in the field of labor relations, dictate that the board's judgment be given "special respect by reviewing courts." [6] NLRB v. Gissel Packing Co., *supra*, 395 U.S. at 612, 89 S.Ct. 1918, 23 L.Ed.2d 547. Our task is not to make a de novo determination of the facts. Fibreboard Paper Products Corp. v. NLRB, 1964, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233. Rather, the board's order must be upheld unless it can be shown that the board either abused its discretion or exceeded its statutory authority.[7] Virginia Electric & Power Co. v. NLRB, 1943, 319 U.S. 533, 63 S.Ct. 1214, 87 L.Ed. 1568; H. K. Porter Co. v. NLRB, 1970, 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146; Daisy's Originals, Inc. of Miami v. NLRB, 5 Cir. 1972, 468 F.2d 493.

Although noting an election is the preferred method for determining employee representation, the Supreme Court in *Gissel* held that the board could issue a bargaining order as the appropriate remedy in certain instances. The Court outlined three categories of unfair labor practices. The first category involved "outrageous and pervasive" unfair labor practices by an employer that were likely to interfere with the board's election process. In such cases, the Court stated that the board could issue a bargaining order without inquiring whether the union possessed a card majority. 395 U.S. at 613, 89 S.Ct. 1918, 23 L.Ed.2d 547. The second category involved "less pervasive" unfair labor

practices by an employer that were nevertheless found to have undermined or have had the "tendency to undermine majority strength and impede the election processes." 395 U.S. at 614, 89 S. Ct. at 1940. In this situation, the board could issue a bargaining order if it found that the union had a valid card majority at some point in the campaign. But there is no requirement that a bargaining order must issue. In determining the appropriate remedy, the board must consider seriousness of the unfair labor practices, the likelihood of their recurrence, and the possibility of a fair rerun election.

> If the Board finds that the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order, then such an order should issue. 395 U.S. at 615–616, 89 S.Ct. at 1940.

The third category involved unfair labor practices found to be "minor or less extensive" in terms of election interference. Such circumstances would not warrant a bargaining order.

■ It is apparent that this is not a case involving "outrageous and pervasive" unfair labor practices that would justify a bargaining order without inquiring into the union's majority status. Rather, if the bargaining order is to be enforced, it must be justified under the second category, that is, less pervasive unfair labor practices that nevertheless tended to undermine the union's majori-

---

6. As the Supreme Court emphasized in *Gissel*, 395 U.S. at 612, 89 S.Ct. at 1939:

    It is for the Board and not the courts . . . to make [the] determination [of remedies], based on its expert estimates as to the effects on the election process of unfair labor practices of varying intensity. In fashioning its remedies under the broad provisions of § 10(c) of the Act . . . the Board draws on a fund of knowledge and expertise all its own, and its choice of

remedy must therefore be given special respect by reviewing courts.

7. The Supreme Court has also stated emphatically that the board's order "should stand unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." Virginia Electric and Power Co. v. NLRB, 1943, 319 U.S. 533, 63 S.Ct. 1214, 87 L.Ed. 1568.

ty status.[8] Applying the principles articulated in *Gissel*, the trial examiner found that the union initially had a valid card majority, and that the company's unfair labor practices had the tendency to undermine that majority. The trial examiner further found that the company's conduct "was not only coercive but so pervasive in character as to make it unlikely that its coercive effects would be neutralized by the remedies normally employed to produce a fair election;" and that the authorization cards were a more reliable indicator of employee wishes than their votes in another election. On the basis of these findings, the board determined that a bargaining order, rather than another election, was the appropriate remedy.

In response, the company first argues that the board has failed to show a direct relationship between the unfair labor practices and the loss of the union's majority status. There is, of course, no requirement that a direct causal relationship be shown.[9] It is sufficient if it can be shown that the un-

fair labor practices had the tendency to dissipate support for the union and that the union subsequently lost its majority. NLRB v. Gissel Packing Co., *supra*, 395 U.S. at 614–615, 89 S.Ct. 1918, 23 L.Ed. 2d 547. The record in the present case clearly indicates that the unfair labor practices tended to accomplish that result.

The company further argues that the board has not shown that a fair rerun election is unlikely. In NLRB v. American Cable Sys., Inc., *supra*, we noted that the board must make specific findings as to the likelihood of a fair rerun election and must not respond "with a litany, reciting conclusions by rote without factual explication." 427 F.2d 446 at 449.[10] Otherwise, reviewing courts cannot determine whether the requirements of *Gissel* have been satisfied and insure that like cases are treated alike. NLRB v. General Stencils, Inc., 2 Cir. 1971, 438 F.2d 894. Specific findings are especially important in cases in which the need for a bargaining order appears less compelling. NLRB v.

8. This court referred to this second category in NLRB v. American Cable Systems, *supra*, 414 F.2d at 668–669:

Under the *Gissel* holding a bargaining order may issue where: (a) a union had valid authorization cards from a majority of the employees in an appropriate bargaining unit; (b) the employer's unfair labor practices, although not "outrageous" and "pervasive" enough to justify a bargaining order in the absence of a card majority, were still serious and extensive; (c) "the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight"; and (d) employee sentiment can best be protected in the particular case by a bargaining order.

Furthermore, we note that the relevant time period for determining the appropriateness of a bargaining order is when the matter is before the board for remedial action. J. P. Stevens & Co., Inc., Gulistan Division, *supra*.

9. In NLRB v. Thompson, Inc., 5 Cir. 1971, 449 F.2d 1333, 1337, the court in dicta stated that a "bargaining order is appropriate even in the absence of proof

that the union's loss of majority was attributable to the unfair labor practices which had been perpetrated by the Company." In Daisy's Originals of Miami v. NLRB, 5 Cir. 1972, 468 F.2d 493 the court interpreted the *Thompson* dictum to mean only that "a direct causal link between the commission of those unfair labor practices which support a *Gissel* order and a union's loss of majority need not be shown." 468 F.2d at 500.

In J. P. Stevens & Co., Inc., Gulistan Division v. NLRB, 5 Cir. 1971, 441 F.2d 514, 527, the court stated:

The Board must, on the objective facts, determine the seriousness of the employer unfair labor practices and consider the possibility of a fair rerun election. . . . Once the Board has done so, if supported by substantial evidence, its bargaining order must be enforced.

10. One reason for the board's reluctance to make detailed findings in many cases is the inadequacy of the present body of knowledge concerning employee voting behavior. For a discussion of this problem, see Getman and Goldberg, The Myth of Labor Board Expertise, 39 U.Chi.L.Rev. 681 (1972).

WKRG–TV, Inc., 5 Cir. 1973, 470 F.2d 1302.

That standard has been met in the present case. The nature of the unfair labor practices and the anti-labor context in which they were committed justify the issuance of a bargaining order.

■■■■■ The company asserts, however, that the unfair labor practices were not serious since they were committed only by "lower level" supervisors. The law is to the contrary. An employer is responsible for the acts of its supervisors. NLRB v. Varo, Inc., *supra*. Moreover, it is undisputed that the company made no effort to disavow the unfair labor practices committed by its supervisors or to assure the employees that those practices would not recur. Its silence during the critical pre-election period reinforced the coercive effect of its supervisors' statements and clearly indicated that it desired to reap the benefits of their misconduct. In these circumstances, the company cannot complain if it is held responsible for the intended consequences of its inaction.

■■■■ The company also points out that no unfair labor practices occurred between early November and the election on January 6 and 7; that this 60 day period is equal to the usual posting period of a remedial notice under board procedures; and that union activity flourished during this period. It asserts that this extended period of tranquility indicates that a bargaining order is not warranted. The company's argument suffers from a twofold misconception. First, the purpose of the posting period is to allow the employer to display remedial notices designed to offset the effects of its unfair labor practices. Here, the company neither posted notices nor made any other effort to eradicate the effects of the unfair labor practices. Furthermore, the trial examiner found that the company's unfair labor practices were so pervasive that their effects could not have been eradicated by a cease and desist order and a 60 day posting period.[11] Second, the touchstone of the national labor policy is employee free choice. J. B. Stevens & Co., Inc., Gulistan Division v. NLRB, *supra*. Whether a free and fair election is possible depends on the facts of each case. It would be wholly inappropriate, therefore, to adopt a per se rule that the mere passage of time, without more, is sufficient to clear the electoral atmosphere of the polluting particles of employer misconduct. In the present case, this "period of tranquility" may well have been perceived by the employees as the calm before the storm.

■■■■ The company's final contention is that a bargaining order is not warranted because after the election 36 of the company's employees sent a petition to the board requesting that another election not be held. The company would conclude that a majority of the employees do not want a union as their collective bargaining agent. This argu-

11. The trial examiner's finding is especially pertinent on this issue:

I find unconvincing Respondent's argument that the practice of a cease and desist order posted for the normal 60-day period, which the Board has at times utilized in the past, will neutralize and fully eradicate the effects of the Section 8(a)(1) violation herein found, so that an election after such posting period will be held in an atmosphere free of restraint and coercion. The argument assumes—an assumption I am unable to accept—that restraint and coercion as extensive and pervasive as that present in the instant case, can be fully eradicated by the mere issuance of a cease and desist order and a 60-day posting period. The rescheduling of an election in such a posture can only serve to recall to the employees Respondent's prior coercive conduct.

Respondent's contention that because the Section 8(a)(1) violations herein found ceased no later than November 12, that the employees' rejection of the Union in the election conducted the following January 6 and 7, must have been for reasons other than Respondent's restraint and coercion which ceased some 55 days prior to the election, is a *non sequitur*. I find it an equally permissible inference that the employees' rejection of the Union if the election resulted from the fact that Respondent's restraint and coercion had a lingering effect which was still manifesting itself at the time of the election.

ment proves too much, however, since it is an equally plausible assumption that the petition merely indicates that the unfair labor practices committed during the campaign continue to affect employee sentiment and make a fair election impossible. An employer cannot be allowed to benefit from employee recantation that is the product of its unfair labor practices. *J. P. Stevens & Co., Gulistan Division, supra.*

After examining the record, we hold that there is substantial evidence [12] to support the board's conclusion that traditional remedies were inadequate; that the authorization cards were a more reliable indicator of employee sentiment than the election; and that a bargaining order was appropriate.

The order of the board is enforced.

Enforced.

12. As the Supreme Court stated in Franks Bros. Co. v. NLRB, 1944, 321 U.S. 702, 705–706, 64 S.Ct. 817, 819, 88 L.Ed. 1020:

> Contrary to [the Company's] suggestion, this [bargaining order] remedy, as embodied in a Board order, does not involve any injustice to employees who may wish to substitute for the particular union some other bargaining agent or arrangement. For a Board order which requires an employer to bargain with a designated union is not intended to fix a permanent bargaining relationship without regard to new situations that may develop. . . . But, . . . a bargaining relationship once rightfully established must be permitted to exist and function for a reasonable period in which it can be given a fair chance to succeed. . . . After such a reasonable period the Board may, in a proper proceeding and upon a proper showing, take steps in recognition of changed situations which might make appropriate changed bargaining relationships.