497 F.2d 43
 86 L.R.R.M. (BNA) 3031, 74 Lab.Cas. P 10,191
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
BIG THREE INDUSTRIES, INC., Respondent.
Tommy J. GRISSOM et al., Plaintiffs-Appellees, Cross-Appellants,
v.
NATIONAL LABOR RELATIONS BOARD, Defendant-Appellee, Big
Three Industries, Inc., Defendant-Appellant,
Cross-Appellee, International
Brotherhood of Teamsters,
Chauffeurs, etc.,
Defendant-Appellee.
 Nos. 73-1921, 73-3680.
 United States Court of Appeals, Fifth Circuit.
 July 10, 1974.
 
 Elliott Moore, Deputy Assoc. Gen. Counsel, N.L.R.B., Washington, D.C., Charles M. Paschal, Jr., Director Region 15, N.L.R.B., New Orleans, La., Abigail Cooley, N.L.R.B., Washington, D.C., for petitioner.
 
 
 1
 Charles R. Vickery, Jr., David S. Brown, Houston, Tex., John B. Williams, Baton Rouge, La., for respondent and defendant-appellant, cross appellee.
 
 
 2
 William R. D'Armond, Baton Rouge, La., for Grissom.
 
 
 3
 Abigail Cooley, N.L.R.B., Glen M. Bendixsen, Chief of Sp. Litigation, N.L.R.B., Washington, D.C., Louis V. Baldovin, Jr., Regional Atty., Region 15, N.L.R.B., New Orleans, La., for N.L.R.B.
 
 
 4
 O. Romaine Russell, Baton Rouge, La., for Teamsters Local.
 
 
 5
 Before DYER and MORGAN, Circuit Judges, and KRAFT, District Judge.
 
 DYER, Circuit Judge:
 
 6
 In these consolidated cases, the Board petitions for enforcement of its orders finding the employer, Big Three Industries, guilty of refusing to bargain with the duly certified union in violation of section 8(a)(5) and (1) of the National Labor Relations Act and of threatening to and subsequently discharging an employee in violation of section 8(a)(3) and (1). In a separate proceeding, certain employees in the bargaining unit, dissatisfied with the union's lack of success, filed a decertification petition with the Board after the expiration of the union's certification year, but subsequent to the union's filing of unfair labor practice charges against the employer. The Board's decision to dismiss the employees' petition was upheld by the district court as an appropriate exercise of the Board's statutory authority. We grant enforcement in full and affirm the district court's judgment.
 
 I. Bargaining Order
 
 7
 The situs of the labor problems presently before us is Big Three's Baton Rouge plant, which is engaged in various cryogenics-related operations of producing and distributing liquidified oxygen and nitrogen. In July 1971 following a Board-conducted election, Local No. 5 of the General Truck Drivers, Warehousemen and Helpers, a Teamsters Union affiliate, was certified as the exclusive representative of the employer's production and maintenance employees. A few weeks later, several union representatives met for the first time with two company negotiators and discussed briefly a proposed union draft of a collective bargaining agreement, which the union tendered with the assurance that all terms were negotiable. At this first session, the employer's chief representative read through the proposals, striking out various provisions as he went along, and stated in substance that 'we won't have this, and we won't have that.' Mincing few words, the representative indicated that with this sort of proposed contract, the company might as well shut down, that the employees would get nothing more than they were presently receiving, that the company could easily close down the Baton Rouge facility as it had previously done with another Big Three plant, and that the union could feel at complete liberty to go on strike.
 
 
 8
 Apparently to no one's surprise, no agreement was reached at this opening session, so the parties resolved to meet again later in the month, at which time the company would offer a set of counterproposals. The parties reconvened on August 26, 1971, but the company failed to produce the anticipated proposals. Instead, the company representative indicated again that the employees would get no more than they were presently receiving, but in reviewing the original union proposals the negotiator agreed to certain provisions in principle which the company would rewrite and submit for further consideration. On various substantive proposals, such as sick leave and temporary work assignments, the chief negotiator indicated that the union's suggestions were rejected and that he would not discuss the matters further, since the status quo on basic terms and conditions of employment would remain inviolate.
 
 
 9
 In September 1971 the company sent its counterproposals and rewritten terms to the union. Importantly, several provisions to which the company had orally agreed in principle at the previous session were conspicuously absent from the proposed draft, such as terms whereby the company would provide space for a union bulletin board and would permit a checkoff for union dues. Other uniondrafted provisions which the company basically assented to and agreed to 'rewrite' were largely eviscerated by the counterproposals, such as the union's proposals with respect to seniority and grievance procedures. The union thereupon rejected the counteroffer as a whole and requested further bargaining sessions.
 
 
 10
 The parties caucused for the third and final time on October 22, 1971. The employer's representatives announced that the previously submitted counterproposals constituted the company's only offer, that further union bickering was pointless, and that if the union persisted in ploughing over the same ground, further negotiations would be a waste of time. The union reiterated that its proposals were negotiable in all respects, but the parties, at complete loggerheads, dispersed without agreement. A subsequent union request for additional negotiations went unheeded, with the company again indicating that any further meetings would be futile. On December 15, 1971, the union filed 8(a)(5) and (1) charges with the Board, which eventually determined that the employer had unlawfully failed to bargain in good faith.
 
 
 11
 Determining whether a party's conduct at the negotiating table evinces an unlawful failure to abide by the statutory mandate to bargain in good faith is an inescapable elusive inquiry. Once the parties embark on the ritual of convening and conversing together, objective standards against which statutory duties can be measured are not readily at hand. N.L.R.B. v. Herman Sausage Co., 5 Cir. 1960, 275 F.2d 229, 231. But at bottom we know that merely meeting together or simply manifesting a willingness to talk does not discharge the federally imposed duty to bargain. Tex Tan Welhausen Company v. N.L.R.B., 5 Cir. 1969, 419 F.2d 1265, 1268, cert. denied, 1971, 402 U.S. 973, 91 S.Ct. 1663, 29 L.Ed.2d 138; N.L.R.B. v. Denton, 5 Cir. 1954, 217 F.2d 567, 570, cert. denied, 1955, 348 U.S. 981, 75 S.Ct. 572, 99 L.Ed. 764. Indeed, 'to sit at a bargaining table . . . or to make concessions here and there, could be the very means by which to conceal a purposeful strategy to make bargaining futile or fail.' N.L.R.B. v. Herman Sausage Co., supra, at 232.
 
 
 12
 Mechanically plodding through the forms of collective bargaining therefore does not suffice, for Congress has required the parties not simply to convene, but to meet and negotiate in a certain frame of mind-- to bargain in good faith. Negotiating parties are thus statutorily adjured to enter discussions with an "open and fair mind, and a sincere purpose to find a basis of agreement * * *." N.L.R.B. v. A. W. Thompson, Inc., 5 Cir. 1971, 449 F.2d 1333, 1335, cert. denied, 1972, 405 U.S. 1065, 92 S.Ct. 1497, 31 L.Ed.2d 795. See also N.L.R.B. v. Truitt Mfg. Co., 1956, 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027. But once the parties are physically engaged in the rituals of bargaining, as the employer and union were here, piercing through the formal litany to detect a want of good faith must rest in great measure on reasoned inferences. And it is beyond dispute that the reservoir of experience and expertise which enhances the likely reasonableness of such inferences is found in the Board itself. As Mr. Justice Frankfurter observed:
 
 
 13
 A determination of good faith or of want of good faith normally can rest only on an inference based upon more or less persuasive manifestations of another's state of mind. The appropriate inferences to be drawn from what is often confused and tangled testimony . . . makes a finding of absence of good faith one for the judgment of the Labor Board, unless the record as a whole leaves such judgment without reasonable foundation.
 
 
 14
 N.L.R.B. v. Truitt Mfg. Co., supra, at 155 (separate opinion).
 
 
 15
 Substantial evidence supports the Board's conclusion that Big Three violated 8(a)(5) and (1). From the outset of the negotiations with the union in August 1971, the employer through its representatives evidenced an belligerent, intransigent attitude completely at war with any genuine 'desire to reach ultimate agreement . . ..' N.L.R.B. v. Insurance Agents' International Union, AFI-CIO, 1960, 361 U.S. 477, 485, 80 S.Ct. 419, 4 L.Ed.2d 454. Evidence abounded by which the Board could reasonable conclude that the company's initial threats to shut the plant down, its taunting the union to go on strike, and its firm pronouncement that the employees would get nothing more than what they were presently getting, aptly demonstrated 'a completely closed mind and (a lack of a) spirit of cooperation and good faith . . ..' N.L.R.B. v. Wonder State Mfg. Co., 8 Cir. 1965, 344 F.2d 210, 215. Once negotiations were seemingly underway, the company, without discussion, summarily omitted from its counterproposals union provisions orally agreed upon and, in 'rephrasing' other proposals which had been assented to in principle, the company substantially rewrote important terms so as to render them completely inconsistent with the previous oral understanding. Once its spurious rewriting services were completed, the company then refused to discuss the revised terms further. Such complete intransigence and refusals to discuss mandatory subjects of bargaining run afoul of the N.L.R.A.'s bargaining requirements. Sweeney & Co. v. N.L.R.B., 5 Cir. 1971, 437 F.2d 1127, 1134-1135.
 
 
 16
 By detecting a lack of good faith in the employer's conduct, the Board is not, as the company would have it, indirectly attempting to impose actual terms on the parties, H. K. Porter Co. v. N.L.R.B., 1970, 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146, nor is the Board seeking to interdict merely a particularly vigorous instance of hard bargaining. An employer can properly insist, and adamantly so, on a bargaining position without contravening statutory requirements. Chevron Oil Co., Standard Oil of Texas Div. v. N.L.R.B., 5 Cir. 1971, 442 F.2d 1067, 1072. But there comes a point when hard bargaining ends and obstructionist intransigence begins. The totality of circumstances in this case adequately supports the Board's inference of bad faith on the part of Big Three by the latter's failure to discuss meaningfully various terms and conditions of employment during the two months of negotiations and its steadfast refusal to meet further after the three unsuccessful sessions, despite the union's requests and assurances that all its proposals were at all times negotiable.
 
 
 17
 The company's retort to the 8(a)(5) charge is unpersuasive. Big Three argues, first, that the union's proposals were tainted with illegality; second, that its proposals were economically preposterous; and third, that the parties bargained to an impasse. Big Three first attacks the union's demands as violative either of the 1971 presidential wage and price freeze or of substantive federal law. We agree with the trial examiner that by and large this broadside attack is a red herring. The intervening wage freeze of August 15, 1971, manifestly did not prevent the parties from bargaining or contracting for wage increases which would go into effect subsequent to the freeze, yet the company inexplicably argues almost three years later that the union's proposals are still somehow violative of a now defunct economic policy. Moreover, the union's wage demands were first tendered, and rejected out of hand with the response that the employees would get nothing more than the then prevailing wages, almost two weeks before the freeze was announced. As for other alleged illegalities infecting the union's proposals, the provisions were either completely lawful or else were amendable to cure technical faults, a possibility which the union consistently offered to the employer by reiterating its willingness to negotiate.
 
 
 18
 Big Three's lament that the union's economic demands were too high is wholly misdirected. Neither the Board nor this Court sits to evaluate the business feasibility of employee wage demands. If the company deemed the wage and benefit proposals 'ridiculous,' then the appropriate posture would have been to bargain with the union in a spirit of good faith, as the union repeatedly announced it was willing to do, until such time as either an agreement or an impasse resulted. Instead, substantial evidence indicated that the company simply refused to discuss proposed wage and benefit changes, given the announced predetermined conclusion that no modifications at all would be forthcoming.
 
 
 19
 Finally, the company's actual bargaining posture answers in full its contention that an impasse was reached in the negotiations. 'Impasse' within the meaning of the federal labor laws presupposes a reasonable effort at goodfaith bargaining which, despite noble intentions, does not conclude in an agreement between the parties. N.L.R.B. v. Palomar Corp., 5 Cir. 1972, 465 F.2d 731, 735. Here the company failed to fulfill this necessary precondition to impasse.
 
 II. Enployee Discharge
 
 20
 Shortly before the union filed refusal-to-bargain charges with the Board in December 1971, the employer discharged one of its control room operators, Fred Rushlow, a known union advocate, following an incident in which a container or vessel under Rushlow's control was overflowed with liquid nitrogen, resulting in damage to the truck bed on which the vessel rested. The Board subsequently determined that Rushlow was not responsible for the damage and that his discharge was in violation of 8(a)(3) and (1) because it stemmed from the employer's anti-union animus. We find that, although the evidence did suggest Rushlow's culpability and that cause for his discharge therefore existed, substantial evidence supports the Board's determination that the actual reason for the discharge was the employer's anti-union sentiments.
 
 
 21
 At the time of his discharge, Rushlow, who had been in Big Three's employ for over two years, was a control room operator, charged with overseeing and operating the plant's control board. In addition to duties at the control board, operators were also responsible for supervising the filling of tanks or vessels with liquid oxygen or nitrogen produced at the plant. Typically, a truck transport belonging to Big Three or a customer would be driven to the plant, parked some twenty or thirty feet from the control room, and filled with liquid gas. The filling procedure would ordinarily be carried out by the operator and his 'helper,' who was assigned miscellaneous tasks in the plant by the operator as different needs arose. During the filling process, truck drivers were required to stay behind their trucks to watch over the process. This precautionary measure was due in part to the fact that relatively crude methods were used for determining when a vessel was completely full. Ordinarily, a vessel would be filled until the liquid began to overflow from the vessel's outlet or vent, at which point the operator or helper would shut off the valves to prevent further overflow. According to the testimony, this overflow procedure was normally followed at Big Three, since other methods of determining the actual volume pumped into a vessel were infrequently operational.
 
 
 22
 On the evening of December 13, a truck owned by a Big Three affiliate, Woodward Wight Big Three, was brought into the plant during Rushlow's shift. Informed that servicing this particular vessel was a rush job,[1] Rushlow, with his helper's assistance, promptly set about filling the vessel. As his helper, Holliday, was simultaneously engaged in other plant operations, Rushlow indicated that he would keep an eye on the vessel from the nearby control room, which was equipped with large windows allowing an operator to observe the filling process, and thus free the helper to proceed with his other tasks. During the filling process, Rushlow attended to the control board, his primary responsibility, and looked out the window at the vessel 'every minute or so' in order to detect the telltale overflow. After some twenty minutes had passed, the ordinary time required for filling vessels of this particular type, Rushlow, while still in the control room, observed liquid nitrogen overflowing from the vent, left the control room and shut off the intake value. He then instructed Holliday to disconnect the hose to prepare the truck for departure, whereupon Holliday heard explosion noises in the vicinity of the vessel. Rushlow promptly investigated and saw long, narrow cracks in the metalplated truck bed on which the vessel rested, apparently caused by a substantial overflow of the extremely cold liquid nitrogen. Rushlow immediately called his superiors to brief them on what had happened and remonstrated with the Woodward Wight driver, who had not remained behind the truck during the filling process. The plant manager arrived and, although the testimony is in dispute, apparently inquired simply as to what happened, and was told by Rushlow that he had allowed the vessel to run over. The manager left the plant without further adieu and on the following morning informed Rushlow that he was discharged.
 
 
 23
 Although we cannot concur in the Board's speculative conclusion that Rushlow was not responsible at all for the damage to the Woodward Wight truck bed, we do agree that the discharge nonetheless contravened section 8(a)(3). Cause for discharge is simply not the sine qua non of 8(a)(3) analysis. This Court has consistently held that the existence of cause cannot validate a dismissal which was in fact motivated by anti-union animus. See N.L.R.B. v. Central Power & Light Co., 5 Cir. 1970, 425 F.2d 1318, 1322; N.L.R.B. v. Southeastern Stages, Inc., 5 Cir. 1970, 423 F.2d 878, 879. As we stated in N.L.R.B. v. Central Power & Light Co., supra, at 1322: 'No doubt, cause existed for the discharge, and (the discharged hireling) was not a model employee. * * * Nonetheless, the existence of cause is not a defense to a discharge actually motivated by anti-union purposes.' In fact, although justifiable grounds may abound, a discharge is unlawful even if it is 'partially motivated by the employee's protected activity . . ..' N.L.R.B. v. Ayer Lar Sanitarium, 9 Cir. 1970, 436 F.2d 45, 50.
 
 
 24
 Moreover, we are mindful that whatever conclusions we might reach were the issue before us de novo, it is not our province to 'displace the Board's choice between two conflicting views' even if we would be justified in deciding the issue differently were it before us in the first instance. Universal Camera Corp. v. N.L.R.B., 1951, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456. For it is the Board which has peculiar 'competence . . . to weigh the significance of the raw facts of conduct and to draw from them an informed judgment as to the ultimate fact.' N.L.R.B. v. Insurance Agents' International Union, AFL-CIO, supra, at 505 (separate opinion of Frankfurter, J.). Thus, the courts uniformly defer to the Board in assessing the credibility of witnesses and in drawing inferences which reasonably are to be derived from the evidence. See, e.g., N.L.R.B. v. Groendyke Transport Inc., 5 Cir. 1974, 493 F.2d 17 (1974); N.L.R.B. v. Finesilver Mfg. Co., 5 Cir. 1968, 400 F.2d 644, 645; N.L.R.B. v. Universal Packing & Gasket Co., 5 Cir. 1967, 379 F.2d 269.
 
 
 25
 We think that substantial evidence undergirded the Board's finding of unlawful discharge, for various extenuating circumstances are clearly reflected in the record which, when combined with Rushlow's outspoken union activism, support a determination of an 8(a)(3) violation. Importantly, Rushlow at all times during the filling process was followed standard operating procedures prevailing in the plant. Substantial testimony was adduced which indicated that control room operators were obligated to keep close surveillance over the plant's central control board. Given this overriding responsibility, auxiliary duties, such as filling vessels with liquid gas, were normally accomplished in the precise manner that Rushlow followed on December 13. Operators would uniformly oversee the filling process from the control room, so that servicing a vehicle would not take them completely away from the control board for a substantial period of time. In addition, despite the dangerous nature of the substances produced in the plant, the customary procedure at Big Three was to overflow a vessel as the means for determining when the container was at full capacity. Consequently, the evidence strongly suggests that throughout the critical time period, Rushlow was performing according to usual procedures which were fully known to the plant supervisors.
 
 
 26
 Moreover, the evidence indicated that certain peculiarities in regard to the Woodward Wight truck may have been important in mitigating Rushlow's responsibility for what occurred. The type of flat-bed truck used by Woodward Wight in this instance was not customarily employed in the cryogenics industry, since transport trucks with built-on containers were typically utilized. Indeed, Holliday, Rushlow's helper, testified that during his year-long tenure at the plant, he had never seen a truck of this type used before. It is therefore likely that Big Three's normal filling procedures were ill-suited for this unusual type of vehicle. But of even greater significance is the fact that the damage to the truck was relatively minor, in that the only evidence of repair expenses produced at the hearing indicated a total charge of $89.00. Rushlow offered to pay for the repairs in full, but his offer was firmly and summarily rebuffed.
 
 
 27
 Although Rushlow was following standard procedures and the damage to the truck was relatively insignificant, Big Three earnestly contends that Rushlow's discharge was necessitated due to the ire of the plant's customer, the president of Woodward Wight Big Three, who was angered over the damage done to his truck bed. The Board could reasonably call this justification into question, since Woodward Wight was a Big Three affiliate in which Big Three had a one-half ownership interest. The likelihood of Big Three's losing this sort of customer account as a result of nominal damage to a truck bed seems highly remote.
 
 
 28
 And it is of some relevance that Rushlow was never afforded a reasonable opportunity to explain the full circumstances of what occurred, including the culpable absence of the Woodward Wight truck driver who, had he not absented himself, could have observed the beginning of the overflow and then informed Rushlow or Holliday, either of whom could have promptly shut off the valves. Big Three suggests that the plant manager's inquiry of Rushlow on the evening of the accident manifested the employer's desire to ferret out the truth, but the Board credited Rushlow's testimony that the plant manager already knew that an overflow had occurred and that he simply wanted to know where the damaged truck was then located. Rushlow was discharged summarily on the following morning, without being able to relate fully the events of the preceding evening. This summary procedure seems particularly odd since, even according to one of Big Three's own witnesses, Rushlow was known as a conscientious, fast-learning control room operator.[2]
 
 
 29
 Our somewhat lengthy examination of the factual circumstances surrounding this discharge is not to suggest that a private employer's employment decisions are per se within judicial scrutiny, since we are fully aware that ordinarily an employer may discharge an employee for any lawful reason whatsoever. soever. N.L.R.B. v. Buddies Supermarkets, Inc., 5 Cir. 1973, 481 F.2d 714, 721-722. But these extenuating circumstances clearly lend additional significance to Rushlow's well-known union sentiments.
 
 
 30
 The evidence unmistakably shows that Rushlow was one of the most active and vocal members of the union with which Big Three unlawfully refused to bargain. Rushlow testified on behalf of the union at a representation proceeding involving Big Three's affiliate, Woodward Wight, some four months before his discharge. He was an active member of the union's negotiating team which met with Big Three's representatives, and on one occasion prompted an angry response from a company negotiator because of his inquiries about company policy. Two months before his discharge at a plant-wide safety meeting, Rushlow called the supervisors' attention to various safety violations and threatened to report the matters to the federal government if remedial steps were not promptly undertaken. During the same period of time, the plant manager, in a conversation with a control room operator concerning the union, stated that there were several employees with whom he could not communicate and that, of these, one in particular, Fred Rushlow, 'had to go.'
 
 
 31
 The totality of these circumstances, particularly when viewed in light of the coincidence of other section 8 violations by the company, see N.L.R.B. v. Central Power & Light Co., supra; N.L.R.B. v. Stemus Mfg. Co., 6 Cir. 1970, 423 F.2d 737, 741-742, demonstrates that, whatever our view might be were the case first before us, the Board's finding was based on evidence which reasonably supports its conclusion. N.L.R.B. v. Federal Pacific Electric Company, 5 Cir. 1971, 441 F.2d 765. The findings of unlawful discharge and an unlawful threat to discharge are based on substantial evidence.
 
 III. Decertification
 
 32
 Our enforcement of the Board's order requiring the company to bargain in good faith substantially influences our disposition of the bargaining unit employees' appeal with respect to the Board's dismissal of their decertification petition. One component of the Board's order remedying the 8(a)(5) violation in this case is the extension of the union's certification year, pursuant to the reasoning of Raynal Plymouth Co., 1969, 175 N.L.R.B. 527. Thus, Big Three is now duty bound to bargain with the union for a reasonable time, an obligation which is utterly inconsistent with the Board's concurrent processing of representation petitions aimed at dismantling the union's status as exclusive bargaining representative. Indeed, one statutorily provided incident of the certification year is that no further representation elections will be held during that time. 29 U.S.C.A. 159(e) (2). See Brooks v. N.L.R.B., 1954, 348 U.S. 96, 101-102, 75 S.Ct. 176, 99 L.Ed. 125.
 
 
 33
 It would be particularly anomalous, and disruptive of industrial peace, to allow the employer's wrongful refusal to bargain in good faith to dissipate the union's strength, and then to require a new election which 'would not be likely to demonstrate the employees' true, undistorted desires,' N.L.R.B. v, Gissel Packing Co., 1969, 395 U.S. 575, 611-612, n. 33, 89 S.Ct. 1918, 1938, 23 .l.Ed.2d 547, since employee disaffection with the union in such cases is in all likelihood prompted by the employer-induced failure to achieve desired results at the bargaining table. No more illustrative instance of this danger need be sought than the decertification petition filed by the disgruntled employees in this case. The handwritten petition, expressive simply of disenchantment with the union's lack of bargaining accomplishments, states: 'it is our feeling that Teamsters Local #5 has accomplished nothing in our favor, therefor we would like a new election to determine if we will continue to be represented by the above union or if we may represent ourselves.' By skillful maneuvering, the employer has sapped union sentiments and relegated the union to minority status.
 
 
 34
 Our decision in this regard is demanded by an abundance of precedent. This Circuit has approved the Board's dismissal of decertification petitions filed during 'insulated' periods of bargaining, N.L.R.B. v. A. W. Thompson, Inc., supra at 1337, even though the union's certification year has expired. General Electric Co., Battery Products, Capacitor Dept. v. N.L.R.B., 5 Cir. 1968, 400 F.2d 713, 727-729, cert. denied, 1969, 394 U.S. 904, 89 S.Ct. 1012, 22 L.Ed.2d 216. A decertification petition, albeit indicative of employee sentiment at a particular point in time, is not a talismanic expression of free choice which obliterates all that has gone before. For, notwithstanding the filing of an employee petition, a union which has 'not been afforded a reasonable opportunity to prove itself as the employees' bargaining agent . . . (can)not be decertified prior to being afforded such an opportunity.' N.L.R.B. v. Montgomery Ward & Co., 7 Cir. 1968, 399 F.2d 409, 410; N.L.R.B. v. Universal Gear Service Corp., 6 Cir. 1968, 394 F.2d 396, 397-398. Union immunity from decertification during protected bargaining periods cannot be eliminated even if the petition represents a clear majority of unit employees, N.L.R.B. v. Cayuga Crused Stone, Inc., 2 Cir. 1973, 474 F.2d 1380, 1383, because of the obvious reason that the union's majority status is inexorably eroded by the employer's refusal to bargain. Franks Bros. v. N.L.R.B., 1944, 321 U.S. 702, 704, 64 S.Ct. 817, 88 L.Ed. 1020; N.L.R.B. v. Hamilton, 10 Cir. 1955, 220 F.2d 492, 494.
 
 
 35
 The reasoning underlying this limitation on temporary employee sentiment flows from the Supreme Court's decision in Franks Bros., supra. As the Court there stated:
 
 
 36
 Out of its wide experience, the Board many times has expressed the view that the unlawful refusal of an employer to bargain collectively with its employees' chosen representatives disrupts the employees' morale, deters their organizational activities, and discourages their membership in unions. The Board's study of this problem has led it to conclude that, for these reasons, a requirement that union membership be kept intact during delays incident to hearings would result in permitting employers to profit from their own wrongful refusal to bargain. (The Board has adopted a) remedy which requires that an employer bargain exclusively with the particular union which represented a majority of the employees at the time of the wrongful refusal to bargain despite that union's subsequent failure to retain its majority. The Board might well think that, were it not to adopt this type of remedy, but instead order elections upon every claim that a shift in union membership had occurred during proceedings occasioned by an employer's wrongful refusal to bargain, recalcitrant employers might be able by continued opposition to union membership indefinitely to postpone performance of their statutory obligation.
 
 
 37
 321 U.S. at 704-705.
 
 
 38
 This result works no injustice to the employees. In the first place, courts have long recognized that employee choice is not necessarily reflected in an election where the employer, by committing substantial unfair labor practices, has poisoned the electoral well. N.L.R.B. v. Gissel Packing Co., supra; International Association of Machinists v. N.L.R.B., 1940, 311 U.S. 72, 82, 61 S.Ct. 83, 85 L.Ed. 50; N.L.R.B. v. Groendyke Transport, Inc., supra; N.L.R.B. v. Kaiser Agricultural Chemicals, 5 Cir. 1973, 473 F.2d 374, 384-385; J. P. Stevens & Co., Inc. v. N.L.R.B., 5 Cir. 1971, 441 F.2d 514, 525 cert. denied, 1971, 404 U.S. 830, 92 S.Ct. 69, 30 L.Ed.2d 59. Indeed, a decertification petition tendered on the heels of employer unfair labor practices may 'merely (indicate) that the unfair labor practices . . . continue to affect employee sentiment and make a fair election impossible.' N.L.R.B. v. Kaiser Agricultural Chemicals, supra, at 385.
 
 
 39
 Second, a bargaining order mandating good-faith discussions with what appears to be a minority union does not inalterably freeze federally protected bargaining relationships. The Supreme Court considered this precise argument in Franks Bros. in the following way:
 
 
 40
 Contrary to (the) petitioner's suggestion, this remedy, as embodied in a Board order (to bargain), does not involve any injustice to employees who may wish to substitute for the particular union some other bargaining agent or arrangement. For a Board order which requires an employer to bargain with a designated union is not intended to fix a permanent bargaining relationship without regard to new situations that may develop. But, as the remedy here in question recognizes, a bargaining relationship once rightfully established must be permitted to exist and function for a reasonable period in which it can be given a fair chance to succeed.
 
 
 41
 321 U.S. at 705.
 
 
 42
 In sum, this array of decisional authority firmly establishes the principle that a bargaining relationship, once established, must be permitted a reasonable period of gestation, during which time the union's status as the employees' exclusive representative must remain inviolate. Since in this case the company has never fulfilled its statutory duty to bargain with the union in good faith, no representation proceedings can be conducted until the conclusion of a reasonable period of good-faith bargaining. 'After such a reasonable period the Board may, in a proper proceeding and upon a proper showing, take steps in recognition of changed situations which might make appropriate changed bargaining relationships.' Franks Bros. Co. v. N.L.R.B., supra, at 705-706.
 
 
 43
 Without even addressing this uniform line of authority, the employees and the intervening employer invoke instead this Court's decisions articulating the salutary principle that the pendency of unfair labor practice charges does not per se warrant the Board's blocking, without investigation, a decertification petition filed by unit employees. Templeton v. Dixie Color Printing Co., 5 Cir. 1971, 444 F.2d 1064, followed in Surratt v. N.L.R.B., 5 Cir. 1972, 463 F.2d 378. Templeton and Surratt sought to vindicate the congressional command in 29 U.S.C.A. 159(c)(1) that whenever a representation petition is filed, 'the Board shall investigate such petition and if it has reasonable cause to believe that a question of representation affecting commerce exists shall provide for an appropriate hearing . . ..'
 
 
 44
 Both these cases involved a critical factor absent in the case sub judice. In each case, either a substantial period of actual bargaining had transpired, Templeton, or, as in Surratt, the union's certification year had expired, subsequent to actual bargaining, before the employees petitioned for an election. In Templeton, moreover, the alleged unfair labor practices had occurred some four years before a decertification petition was filed, and some seven years by the time of appellate review. Given this lengthy time lapse, this Court found it highly unlikely that any past unfair labor practices could still be influencing the employees' free choice at that much later date. Importantly, in the case sub judice no Templeton time lag has occurred and there has never been a protected period of good-faith bargaining, demanded by Franks Bros. and its progeny, which was present in Surratt.
 
 
 45
 Moreover, even if these significant factual distinctions were not present, it is imperative to recall that Templeton required not the full processing of decertification petitions, but simply an investigation of such petitions to determine whether a question of representation exists. On this record, we cannot find clearly erroneous the district court's determination that the Board did in fact comply with the statutorily imposed investigation requirement, for where the Board, in response to an employee petition, investigates sufficiently to determine that a non-frivolous charge has been made that no Franks Bros.-demanded period of bargaining has ever occurred, then the Board has thereby gathered sufficient operative facts to determine whether a representation question is actually presented. This the Board has done, and Templeton requires no more.
 
 
 46
 Enforcement granted.
 
 
 47
 Affirmed.
 
 
 
 [1]
 There is disputed testimony as to whether Rushlow was specifically told to 'top the vessel off,' meaning that the vessel was already partly filled, thereby reducing the time needed for filling. The trial examiner discredited the company's testimony to this effect
 
 
 [2]
 On the other hand, the employer adduced evidence that Rushlow had been warned previously to control his temper. The plant manager who fired Rushlow, nonetheless, testified that the only reason for the discharge was due to the vessel's overflowing